Evans v. Steele.

W. G. EVANS *v.* P. C. STEELE, *Clerk of County Court.*

(*Nashville.* December Term, 1911.)

1  BILLS AND NOTES.  Possession is prima facie evidence of ownership of bank bills.

The possession of bank bills, issued by the Bank of Tennessee, whose charter provided that they should be receivable by the State in the payment of taxes and dues to the State, makes a *prima facie* case of ownership in the holder. (*Post, pp.* 486-491 and especially 488, 489.)

Acts cited and construed:  Acts 1837-38, ch. 107, sec. 12; Acts 1885, ch. 83; Acts 1901, ch. 89.  See Acts 1883, ch. 104, repealed by Acts 1901, ch. 88.

Cases cited and approved on this headnote, and on other points historically stated in the opinion, as follows:  Furman v. Nichol, 3 Cold., 433; State, ex rel., v. Sneed, 9 Bax., 472; Keith v. Clarke, 4 Lea, 718; Clark v. Keith, 8 Lea, 704; Marr v. State, 10 Lea, 470; Noteholders v. Funding Board, 16 Lea, 46; Furman v. Nichol, 8 Wall., 44; State, ex rel., v. Sneed, 96 U. S., 451; Keith v. Clark, 97 U. S., 454.

2. STATUTES OF LIMITATIONS.  Do not run against bank notes issued to circulate as money as a special obligation against the State.

The notes of the Bank of Tennessee were issued to circulate as money, and under its charter were a special obligation of the State, receivable by it in the payment of taxes and other dues owing to it; and, therefore, there is no statute of limitation applicable to them, or that will run against them. (*Post, pp.* 492, 493.)

Acts cited and construed:  Acts 1837-38, ch. 107, sec. 12; Acts 1885, ch. 83.

3. **LACHES.  Chancery will refuse relief on stale demands after loss of evidence so that decree cannot be pronounced with confidence.**

Relief is generally refused by courts of equity, because of the lapse of time, in cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence, though defendant does not show absolutely that his defense has been actually lost or prejudiced; for it is sufficient if it can be seen that the defendant has been deprived of an advantage which he might have had if the complainant's claim had been seasonably presented. (*Post, pp.* 494, 495.)

Cases cited and approved: Bolton v. Dickens, 4 Lea, 577; Mackall v. Casilear, 137 U. S., 556.

4. **SAME.  Same.  Case in judgment, where relief on notes of the Bank of Tennessee, tendered in payment of taxes, was refused for laches of more than forty years.**

The Bank of Tennessee, under the 12th section of its charter (Acts 1837-38, ch. 107), providing that its notes should be receivable at the treasury of the State and by all tax collectors and other public officers, in all payments for taxes and dues to the State, issued regular notes and notes denominated as "Torbett" or "post" notes. After the close of the war between the States, a general creditors' bill was filed, under which a receiver was appointed, and the assets of said bank were distributed among its creditors, including a large number of the holders of said Torbett or "post" notes, and thereafter Acts 1885, ch. 83, was passed, authorizing the funding of said notes by exchanging therefor certificates issued by a funding board, which act remained in force until 1901 (Acts 1901, ch. 89). The complainant, in payment of an inheritance tax, tendered to the proper county court clerk a "post" note of said bank for five hundred dollars, and a small amount of the regular notes of said bank; and, upon the clerk's refusal to

Evans v. Steele.

accept them, he paid the amount due in legal tender money, and filed his bill to recover it back. In view of the fact that said notes had been receivable by the State for more than forty years; that complainant's delay was wholly unexplained; and that, through loss of evidence, the State was unable to establish a defense, it was *held* that complainant's demand was barred by laches. (*Post, pp.* 486-496, and especially 495, 496.)

Acts cited and construed: Acts 1837-38, ch. 107, sec. 12; Acts 1885, ch. 83; Acts 1901, ch. 89.

Cases cited and approved: Hammonds v. Hopkins, 3 Yerg., 525; Lafferty v. Turley, 3 Sneed, 157; Parkes v. Clift, 9 Lea, 524; Pope v. Harrison, 16 Lea, 82; Parker v. Hotel Co., 96 Tenn., 252; Hammond v. Hopkins, 143 U. S., 224; Abraham v. Ordway, 158 U. S., 416; Willard v. Wood, 164 U. S., 510; Chase v. Chase, 20 R. I., 202.

## FROM BEDFORD.

Appeal from the Chancery Court of Bedford County. —W. S. BEARDEN, Chancellor.

W. B. BATES and COLEMAN & FRIERSON, for complainant.

ATTORNEY-GENERAL CATES and B. D. KINGREE, for defendant.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

The complainant, Evans, is the owner, by purchase, of an undivided interest in the estate of Joseph H. Evans, deceased, and as such became liable to the State for $516.74 inheritance tax. He tendered to the defendant, as clerk of the county court, $510.50, by offering to pay that amount in bills of the Bank of Tennessee, consisting of one bill for $500, one bill for five dollars, five bills for one dollar each, and one fifty-cent bill or shinplaster, and the remainder in lawful money of the United States. The clerk refused to accept them, whereupon the complainant paid the amount due in legal tender moneys of the United States, and brought this bill to recover it back.

No history of the alleged bills of the Bank of Tennessee is given in the record, other than is disclosed by the insignia and inscriptions upon the bills themselves. The complainant rests his case alone upon the fact of possession of the bills, which, under the authorities hereafter noticed, makes a *prima facie* case of ownership. The bill for $500 purports to be one of the "Torbett" or "new" issue of the Bank of Tennessee, and has generally been designated as a "post" note. The smaller denominations purport to be notes of branch banks, and are the regular issue.

The twelfth section of Acts of 1837-38, ch. 107, incorporating the Bank of Tennessee, provides "that the bills or notes of said corporation originally made payable, or which shall have become payable on demand in gold or silver coin, shall be receivable at the treasury of the State, and by all tax collectors and other public officers,

in all payments for taxes and other moneys due the States." The Bank of Tennessee was capitalized at $5,000,000, and was organized and opened for business soon after the passage of the acts incorporating it, supra, and continued in business, with its principal office at Nashville, Tenn., until February, 1862. About the 15th of February, 1862, on account of the exigencies of the civil war then in progress, the bank with its assets was removed from Nashville to Columbia, Tenn., and from thence to Memphis, Tenn., and from thence to Chattanooga, where it remained until the summer of 1863, and from Chattanooga it was removed to Atlanta, Ga., and from Atlanta, Ga., to Griffin, Ga., and from Griffin, Ga., to Greensboro, Ga., and from thence to Augusta, Ga., and from thence to different places in the State of North Carolina, and from North Carolina back to Augusta, Ga., where its assets were seized by the Union forces and returned to Nashville.

The bank authorized and used its regular issue of notes in the usual and ordinary denominations, and in addition it had plates prepared to issue what it denominated "post" notes. These notes were in denominations of $500 and $1,000, and were payable in one, two, and three years after date. Some time in the year 1861, and subsequent to May 6th, the bank had used up the regular impressions from which were made the notes of usual and ordinary issue, and because of the war could not obtain more. It had on hand numbers of impressions of the "post" note form, in denominations of $500 and $1,000 each, and many of these "post" note impressions

were used for ordinary issue by erasing the words "Post Notes" therefrom. After the war closed, a general creditors' bill was filed against the Bank of Tennessee in the chancery court for Davidson county, a receiver was appointed for its assets, and the assets were distributed among its creditors. It, of course, did not pay its debts in full; but a large number of its notes, among them the "Torbett" issue, were filed in the case and participated in a pro rata distribution of the assets of the bank.

Litigation arose between the holders of these notes and the State; it being claimed by the State that many of them were invalid, because issued and used in aid of the rebellion, and many others were forged or fraudulently issued. The general result of these suits with respect to the issue subsequent to the Ordinance of Secession, May 6, 1861, was that such notes were not necessarily void because issued at a time when the State was in insurrection against the government of the United States; but, if they were issued in the ordinary course of business of the bank, they were legal obligations against the State under the twelfth section of the charter of the bank, and were receivable in payment of taxes which might be due the State to the same extent as the notes issued prior to May 6, 1861; that all notes of the Bank of Tennessee which were in fact issued in aid of the "rebellion" against the government of the United States were absolutely void. The burden was upon the holder to show that the notes were genuine, and when this burden was satisfied by sufficient proof,

possession of the note was *prima facie* evidence of ownership; and the burden then shifted to the State to show that the notes were issued in aid of the "rebellion." This might be shown, either by proof that the identical bills were issued in aid of the "rebellion," or that the class of notes to which they belonged were issued and circulated in aid of the "rebellion." For a history of the litigation, see *Furman* v. *Nichol,* 3 Cold., 433; *Furman* v. *Nichol,* 8 Wall., 44, 19 L. Ed., 370; *State, ex rel.,* v. *Sneed,* 9 Baxt., 472; *State, ex rel., v. Sneed,* 96 U. S., 69, 24 L. Ed., 610; *Keith* v. *Clark,* 97 U. S., 454, 24 L. Ed., 1071; *Keith* v. *Clarke,* 4 Lea, 718; *Clark* v. *Keith,* 8 Lea, 704; *Marr* v. *State,* 10 Lea, 470; *Noteholders* v. *Funding Board,* 16 Lea, 46, 57 Am. Rep., 211.

After the determination of this litigation in favor of noteholders, the legislature enacted chapter 83, Acts of 1885, by which it authorized the funding of "post" notes of the denominations of $500 and $1,000, and the small notes of less denominations than five dollars but not less then one dollar. This was accomplished by creating a funding board and directing it to prepare certificates for all "legitimate outstanding 'post' notes, including the smaller notes, but of denominations not less than one dollar," and exchange these certificates in convenient denominations for the bank notes referred to. It was provided that, when such notes were presented to the funding board for exchange, it should have the notes examined by competent experts for the purpose of determining the genuineness of the notes. If they were found to be genuine, the board was directed

to exchange certificates therefor, and receive the bank notes, and cancel and preserve them for such examination as the legislature might thereafter direct. It was further provided that all notes presented to the funding board in exchange of the certificates, which upon examination by them should be found to be counterfeit, should be excluded and marked counterfeit, and returned to the owner, or party presenting the same, after the description of the note had been entered in a book kept for that purpose. The certificates to be issued in exchange for the bank notes were receivable at any time before or after due in payment of all final judgments then outstanding and subsisting against defaulting and delinquent revenue collectors or their securities, and decrees in favor of the State, and in payment of all back taxes and other dues to the State which became payable before the year 1884, and also in payment of all taxes and other dues to the State, when such certificates or warrants should be due.

Many thousands of dollars of the "Torbett" issue were presented to the funding board to be exchanged for the certificates provided for in the act of the legislature, supra. In due course, litigation arose between the funding board and certain noteholders with respect to the fundability of certain notes. *Noteholders* v. *Funding Board*, supra. The opportunity to fund the bank notes was afforded holders thereof until 1901, when the funding board acts were repealed.

It appears that all of the books of the Bank of Tennessee, including its note register, are lost and could not be

produced upon the trial of this case. Its officers, direc-
tors, bookkeepers, and clerks are all dead. Witnesses
not connected with the bank, who may have had some
knowledge with respect to the issue of the notes in ques-
tion, are presumably dead. The only witness for the
complainant upon the genuineness of the notes was an
employee of the funding board, and he expressed the
opinion that the notes in issue bear the genuine signa-
ture of the president and cashier of the Bank of Ten-
nessee. In his direct examination, he would appear
to have gone further in his testimony, and to have
stated that the note was issued by the bank in the ordi-
nary course of business and entered upon its note regis-
ter as provided by its charter; but, upon cross-examina-
tion, he makes it clear that all that he knows, or intends
to say, is that in his opinion the note bears the genuine
signature of the officers of the bank. He also states
that he did not find upon the register of the bank,
which he had in his possession while with the funding
board, any description of this particular bill No. 223.
This witness also states that he has no knowledge of
where the bill No. 223 came from, and that it may have
been in litigation between the complainant and the fund-
ing board a number of years ago. The funding board
kept a record of all notes that were funded, but the
witness does not know whether any record was kept of
notes received for taxes. There is no proof in this case
to indicate whether the notes in question have ever been
received in payment of taxes or funded.

The notes of the Bank of Tennessee were issued to circulate as money, and for that reason there is no statute of limitation applicable to them which would bar the complainant's action.   However, they were not a general obligation of the State to pay the holder their value in gold or silver or other legal tender money of the United States.   The State's liability upon the notes of its bank was fixed and defined by section 12 of the bank's charter, which limited such liability to the receipt by the State of all such notes in payment of taxes and other moneys due it.   The State did never agree to levy upon and collect taxes from its citizens for the payment of the bank's notes, nor did it in any wise obligate itself to take moneys from its treasury to redeem them.   The bank was never able to issue notes legally after its assets were captured by the Union forces in 1864, and perhaps after 1862.   It is a part of the history of this State that the notes of this bank have not circulated as money since the war.   Therefore they amount to nothing more than a special obligation of the State to receive them in payment of taxes, and for other moneys due it from the holder of the notes.   It is assumed by the funding act, supra, that many of these notes were both forged and fraudulently issued, and in adopting the funding scheme the legislature provided a method for determing the genuineness of all notes presented to the funding board.   The conditions surrounding the bank after its flight from Tennessee would make possible the issue of many notes not genuine after that time, if, indeed, it would not make impossible the issue

Evans v. Steele.

of any notes for which the State should be held liable. Certainly the bank could not be engaged in business, nor could it issue its notes in due course, while moving from place to place, and from one State to another, in the wake of the Confederate army.

There is a mere suggestion in the evidence that these particular notes have been in controversy between the State and their holders. While this fact is merely suggested by a question and an answer, after the lapse of so long a time before any claim is made under the notes, the suggestion itself is entitled to much weight. Especially is this true when taken in connection with the established facts that many notes were presented in the chancery court for *pro rata* payment in the general creditors' suit by which the bank was wound up and its assets distributed among its creditors, and the further fact that there was much litigation between the funding board and holders of notes, in which many thousands of dollars were involved, and which resulted in a general agitation and discussion at the time of the fundability of notes of a certain class, coupled with a total absence of all proof that the notes in controversy were not filed in the general creditors' suit, have not been presented to the funding board and rejected, and have not been received in payment of taxes. We do not say that there was any obligation upon the holders of notes of this class to present them to the funding board and receive in exchange therefor the certificates provided by the funding act; but the fact that noteholders generally, who held genuine notes, were presenting them to the funding board and receiving certifi-

cates, together with the fact that holders of notes which were fraudulent or forged were likewise presenting notes to the funding board which were rejected by that body, makes the unexplained delay of presentation of these notes at least suspicious.

Delay merely is not sufficient to repel complainant in a court of equity. The true doctrine concerning laches is believed to be that, in order for it to operate as a bar to complainant's suit, it may have resulted in prejudicial delay. Relief is generally refused by courts of equity, because of the lapse of time, only in such cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence. *Bolton* v. *Dickens*, 4 Lea, 577. However, it is not essential that the defendants show absolutely that a defense has been lost or a right obscured as a result of the delay. It is sufficient that it appear to the court that the complainant's demand is uncertain, or that the defendant probably had a good defense to the suit. Where entire justice cannot be done by reason of the gross negligence or deliberate delay of the complainant to assert his claim, equity will not aid a party whose application is "destitute of conscience, good faith, and reasonable diligence." *Mackall* v. *Casilear*, 137 U. S., 556, 11 Sup. Ct., 178, 34 L. Ed., 776. The doctrine of laches in courts of equity is not an arbitrary or a technical doctrine. No hard and fast rule for its application can be formulated. But,

when the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief. It is not required that the defendant should establish by proof an affirmative injury. It is sufficient if by the laches and delay of complainant it has become doubtful whether the defendant can command the evidence necessary to a fair presentation of the case. Or, if it can be seen that the defendant has been deprived of an advantage he might have had if the complainant's claim had been seasonably presented, a court of equity will not interfere to grant relief.

The delay in this case is wholly unexplained. The notes are demand notes. They were receivable for taxes and all debts due the State each year for more than forty years. No reason exists in law why complainant should not have presented them sooner, if genuine, and no reason in fact is suggested in the evidence. The holder of these notes must have known that the State claimed at least two defenses to this particular class of notes, and that it had interposed them against many notes in litigation between it and their holders many years ago, when the witnesses were alive and the facts could be ascertained. It is now beyond the power of the State to establish these defenses. The loss of this evidence has resulted solely from the complainant's delay. It would now be inequitable and unconscionable to enforce the complainant's demand, when it can be clearly seen that the State may have a sufficient defense thereto, but which it has lost in the obscurity of time. The delay in presenting this claim has been willful and

deliberate. The complainant cannot be permitted to reap its advantages, nor the defendant to suffer loss therefrom. *Chase* v. *Chase*, 20 R. I., 202; 37 Atl., 804; *Abraham* v. *Ordway*, 158 U. S., 416, 15 Sup. Ct., 894, 39 L. Ed., 1036; *Willard* v. *Wood*, 164 U. S., 510, 17 Sup. Ct., 176, 41 L. Ed., 531; *Parker* v. *Bethel Hotel Co.*, 96 Tenn., 252, 34 S. W., 209, 31 L. R. A., 706; *Hammonds* v. *Hopkins*, 3 Yerg., 525; *Pope* v. *Harrison*, 16 Lea, 82; *Lafferty* v. *Turley*, 3 Sneed, 157; *Parkes* v. *Clift*, 9 Lea, 524; *Hammond* v. *Hopkins*, 143 U. S., 224, 12 Sup. Ct. 418, 36 L. Ed., 134; 16 Cyc., pp. 152, 160, 163-165.

The decree of the chancellor is reversed, and the bill is dismissed, at complainant's costs.