## LEDFORD et al. v. LEE et al.—200 S. W. (2d) 393.

Eastern Section.    September 5, 1946.

Petition for Certiorari denied by Supreme Court, February 8, 1947.

Thomas, Folts & Brown and Joe Frassrand, all of Chattanooga and Robert S. Clemmer of Pikeville, for appellants Pat F. Lee, Thomas O. Lee, J. Brown Lee and Darius Lee.

Harry G. Sabine, of Crossville, for appellant administrator.

Solon L. Robinson, of Pikeville, and Lewis S. Pope, of Nashville, for appellee E. A. Lee.

BURNETT, J. On July 17, 1943, the original bill was filed by the administrator of T. B. Lee, deceased, and Hamilton National Bank of Chattanooga, against the widow and heirs at law of T. B. Lee, deceased, in the nature and form of a general creditors bill. A note held by the bank is sued on. The estate is alleged to be insolvent. Insolvency was properly averred in County Court and the bill asks that the cause be transferred to the Chancery Court "to the end that all necessary references be ordered and all proper accounts be taken and proper distribution of the estate be made among those entitled."

The bill sought to have certain deeds (fully described and set forth in the bill) "decreed to be fraudulent, null and void as against complainants, and as against all other creditors of the estate of T. B. Lee, deceased," and that the lands be sold.

On July 20, 1943, E. A. Lee, one of the sons of T. B. Lee, and a defendant to the original suit, filed a petition herein against the estate for the funeral bill of his father, T. B. Lee.

On August 16, 1943, J. Brown, Pat F., Thomas O , and Darius Lee answered the original bill denying the material averments thereof. They among other things deny the insolvency of the estate and say: "said deeds were not fraudulent or made to hinder, delay or defraud creditors, and they were based on sufficient considerations."

The note sued on by the bank was purportedly signed by T. Y. Swafford, Emma Lee Swafford (two of the defendants of the bill) and T. B. Lee as security. Emma Lee Swafford is a daughter of T. B. Lee. The Swaffords, on August 18, 1943, filed a duly sworn plea of non est

factum in which they deny that the note was signed by them or by anyone authorized by them. They also say: "inasmuch as the administrator has failed or refused to make defense on the part of the estate to said note, . . . that said note was not executed by said T. B. Lee or by anyone authorized to bind him in the premises."

Some of the other defendants answered. Others made no answer. No pro confesso was asked or taken against the non answering defendants, one of whom is the appellee, E. A. Lee. No affirmative right is averred against E. A. Lee. On the face of the bill he is a party merely because he is a son of T. B. Lee, deceased.

Over three hundred pages of proof is taken on the claim of the banks. The major portion of this testimony consists of the direct and cross examination of E. A. Lee who was called to testify by the complainant, i. e., the bank and the administrator.

A brief summary of this evidence must be made to show the necessity of E. A. Lee's testimony.

The suit of the bank was on a note dated March 3, 1942, for $2,740 and due in thirty days. This note was purportedly signed T. Y. Swafford and Mrs. T. Y. Swafford. This note was a renewal of a note that the bank had held since 1930. Originally the note was much larger but it had been reduced. To this note the bank held a note dated May 29, 1939, for $3,225 signed by the above parties and T. B. Lee (sec.). Their suit against the Lee estate was based on the latter note which was the last one they received before T. B. Lee's death on June 4, 1939. After learning of Lee's death this last mentioned note was held by the bank and the makers allowed to renew it periodically.

It developed in the proof that none of these signatures were the signatures of the purported signers but that these names had been signed to these notes by E. A. Lee. He says that his authority to do so was by virtue of a power of attorney from his father, T. B. Lee, dated June 22, 1935. He says further that T. Y. Swafford signed the original note and others afterwards and also signed his wife's name. That it was his custom and he was authorized by Swafford to sign these notes for him. He also says Mrs. Swafford (E. A. Lee's sister) had no knowledge that her husband or E. A. Lee was signing her name to these notes until he asked her to assign certain life insurance as security therefor. She assigned this life insurance and by so doing he assumed he should continue to sign her name to the notes. This debt or note of the bank was a direct liability of the Swaffords on which the father of Mrs. Swafford, T. B. Lee, was surety.

E. A. Lee for many years was connected with the First National Bank of Pikeville. For some years prior to April 1, 1942, he was its cashier (the highest executive office). He resigned this position effective April 1, 1942, on request of the directors. There was no renewal of the note in question after E. A. Lee's resignation. There was no apparent objection to a renewal as long as he was connected with the bank, i e., the Pikeville Bank, it being an affiliate of the complainant bank. E. A. Lee says that from and before his father's death he, E. A. Lee, paid the interest and reduced the principal of this note out of his, E. A. Lee's own funds. In the course of his testimony he testifies to having paid out of his own funds over eight thousand dollars for his father. The most of this was paid after the death of his father on June 4 1939. Most if not all the liability of his father was of long standing. Inferentially, most of this indebtedness has been

kept alive by E. A. Lee signing the names of his father and others to renewal notes. Part of the sum was what he paid on the note of the complainant bank and for premiums on a life insurance policy, on the life of Swafford, held as collateral by him to secure his father as security or endorser on the complainant bank note. A few hundred dollars of the sum allegedly paid was for taxes on the property herein involved. The remainder he paid was on notes to the Pikeville Bank that his father, T. B. Lee, was directly liable or was endorser on.

The deeds of T. B. Lee, deceased, sought to be set aside were made to three of T. B. Lee's sons. These deeds were dated October 5, 1931, and were acknowledged on December 12, 1931, before Solon L. Robinson, Notary Public, one of the present counsel for E. A. Lee. Judge Robinson also drafted the deeds. Within a very few months after these deeds were executed and delivered E. A. Lee knew of their existence. He, E. A. Lee, insisted that they not be recorded because of the note held by the complainant bank. They were not recorded until 1942, after E. A. Lee had severed his connection with the Pikeville bank. The complainant bank did not know of these deeds until they were recorded. It is attempted to be shown that the execution of these deeds in 1931 made T. B. Lee insolvent. The testimony on this question though is purely hindsight. There is no competent proof on the subject.

In this state of the record, the Chancellor decreed in a chambers decree on May 31, 1944, that the complainant bank have a judgment on the note sued on. The judgment was against the administrator "and a lien is hereby declared upon the real estate described in the bill for the purpose of enforcing the judgment. Order of sale, however, is suspended temporarily, but the cause shall be and remain open for further applications, order of sale

and any proceedings necessary to enforce the decree.''
On June 24, 1944, a chambers decree was entered ordering
this cause ''to stand as a general creditors bill'' giving all
creditors a right to file their claim until the 1st Monday
of September, 1944. On July 14, 1944, counsel for com-
plainant bank withdrew ''since all matters in controversy
in so far as our clients are concerned have been disposed
of.''

On July 28, 1944, an assignment of the aforementioned
judgment was filed. This assignment was from the com-
plainant bank to Pat F. Lee, Thomas O. Lee, Darius Lee
and J. Brown Lee, the appellants here.

The record shows that on May 20, 1944, E. A. Lee,
the appellee, filed his petition herein against the estate
of his father, T. B. Lee, for in excess of Ten Thousand
Dollars, principal and interest. This petition is made up
of six items—the sixth being for the identical item claim-
ed when he filed his petition herein three days after the
original bill was filed.

It was said in oral argument and not denied that this
petition of May 20, 1944, was marked filed by the Clerk
and Master and immediately pocketed by counsel for
E. A. Lee and that the appellants had no knowledge there-
of until after the judgment in favor of complainant bank
had been purchased by them.

On September 1, 1944, formal exceptions were filed by
appellants to the petition of E. A. Lee.

Based upon the testimony of E. A. Lee, given when
called by the administrator to testify for the complain-
ant bank, the Chancellor gave judgment in favor of E. A.
Lee against his father's estate in excess of Ten Thousand
Dollars. He also held that the decree of May 31, 1944, in
favor of the complainant bank, holding the deeds of Oc-
tober 5, 1931, fraudulent and void, sufficient to cover the

claim of E. A. Lee. The decree further recited: "If not, then the order and decree herein should be made now since these parties each and all had notice of petitioner's claim at and subsequent to the death of T. B. Lee, and before recordation of their respective deeds."

To this last mentioned decree the appellants seasonably excepted, prayed an appeal and have here assigned appropriate errors.

In our study of this rather involved record consisting of four "batches" we note that the Chancellor provided in his decree of June 24, 1944 (this is the decree making this a general creditors suit and allowing claims as the one now before us, to be sued on) that. "All creditors filing petitions in this cause will execute and file proper prosecution bonds or take the pauper oath in lieu thereof. Such petition may be filed without other leave than this order."

There was no prosecution bond or pauper oath filed to or with the petition of E. A. Lee.

The bulk of this larger record is made up of the testimony and exhibits of E. A. Lee. This testimony discloses that for many years (before 1930 and until he left the bank) he managed the business affairs of his father. He apparently, during this time, signed his father's and brothers' names to notes, etc. He made financial statements for his father. One of these is filed herein which shows the father perfectly solvent—worth several thousand dollars more than his indebtedness. This statement in the handwriting of E. A. Lee was made December 3, 1934. This was shown in cross examination on February 25, 1944. When he is examined on direct examination some eight months later, in offering proof on his claim herein, he says:

"I have been unable to find any property other than real estate owned by my father at the time the deeds were made and at his death."

This testimony was offered in an effort to prove on his behalf that his father was insolvent after executing the deeds of October 5, 1931, now in question. Compare the above statement to another made eight months before wherein he said:

"You know whether or not his personal assets were sufficient to satisfy this Hamilton obligation?

"Well, I don't know just what his equity might have been in the cattle,—mules, horses, cows, etc. It was my impression that he had ample live stock and liquid assets at the time he made the deeds to have taken care of this obligation, if they had been applied at the time, or thereabout."

In the examination of this witness (appellee) when he testified in February 1944, he is cross examined at length about his payments of his father's obligations. The following answer to one of these questions is most revealing:

"Well, that brings up a long story. At one time I was in debt, when I built my building here, to my father, to the extent of $5,000.00, besides this $2,000.00 in question he wanted to give me. All those period of years with all I have paid—I have more than paid that, and several years ago that note was taken up and paid and destroyed, and I kept on paying, and when I sat down to make a mental calculation of the thing, and get up those records, I found I had paid him back, and then paid quite a bit more."

The $2,000 referred to by the witness above is $2,000 he says at another place was what his father wanted to give him when the deeds here in question were made in 1931. On direct examination he was asked why his father

preferred the three boys who were grantees in these deeds.

"Well, no, I don't know why he did it. I didn't know at the time he did it,—I knew afterwards. I knew at the time my father made the conveyance, or rather it was rumored to me that he had made the conveyance, and when my brother came to me, J. Brown Lee, and told me this, he said I owed $2,000.00, and he wanted me to have that. I told him I was not interested in that, I was sorry that it was done,—that the deeds were made, but that my father was his own boss and that I didn't blame anybody, —that I didn't want to be a party to it,—I think my brother can substantiate that.

"I was talking to my brother, J. Brown, however, I cared nothing about the $2,000.00, but that was in those depression years of 1930 or '31—'31, I believe—and after that I paid a sufficient amount, I think, or more than paid that amount, and other debts I owed my father, and quite a bit in addition to that. I made this statement for the reason when it come up you might not have to have me back, and that will cover it."

On direct examination he was asked why the deeds were not recorded until after his father's death. He answered thus:

"All I know about that is that on a number of occasions after my brother told me about the deeds, several years —I would say a few years afterwards—and I might add it was after this obligation was made at the Hamilton National Bank, that I discussed, on a number of occasions, with Brown and Pat, separately and together, that the deeds should not be recorded until this obligation was paid."

On cross examination he was repeatedly asked when he first knew the deeds were made. He says:

"It was after they were made, sure, but don't remember how long it was,—I just can't recall how many months, whether a year, one month or two months, or six months.

"I would say he told me shortly, or immediately, or six months or a year,—it is my impression he told me shortly after, but don't know how many months, one, two, three or six.

"You don't think it would be longer than a year after they were executed?·

"I don't think it would. In fact, I don't think it was but a few months, if that long, but I don't know."

This witness on several instances says that his instructions to his brothers were that they were not to record the deeds until the complainant bank loan was paid. This was his only reason for not wanting them recorded.

Stated in the form of a question the proposition here is: Can A, knowing B's (A's father's) financial status, have deeds made by B to A's brothers twelve years before set aside as fraudulent and void when A knew of the deeds during that period and acquiesced therein until after B's death, for obligations of B paid by A long subsequent to A's knowledge of the deeds?

"Creditors who have contracted debts under such circumstances that knowledge of previous voluntary transfer must be imputed to them cannot be regarded as hindered, delayed, or defrauded by such transfers, and therefore, they may not attack such conveyances for the purpose of obtaining collection of their debts." 24 Am. Jur., page 287, section 145.

The above quotation is almost the identical language used in a note in 14 American State Reports at page 751 (the only difference being that the above quotation is in the past while the American State Report is in the

future), which was expressly approved and followed by our Supreme Court in Long v. True, 149 Tenn. 673, 261 S. W. 669.

In Nelson v. Vanden, 99 Tenn. 224, 42 S. W. 5, it was held that "a voluntary conveyance is valid as to a subsequent creditor who had actual or constructive notice of the conveyance when the debt was contracted and no actual fraud was practiced upon him, although existing creditors remained unpaid, and the conveyance is fraudulent as to them." This case distinguishes the earlier cases in which it was held that, if a voluntary conveyance is made with the intent to defraud existing creditors it will, in general, be held void as to subsequent creditors. Long v. True, supra.

The above quoted language and holdings of our Supreme Court seem to us a complete answer to the question here.

The instant case is a much stronger case on behalf of the conveyces of this property than were any of the cases cited. In the instant case there is no intimation or indication that there was any intent to commit a fraud when these conveyances were made, i.e., as distinguished from what might have been a fraud in law. The only proof on the issue is from the appellee who testifies about things that a dead man alone might clear up. The testimony of this witness to say most is not overly convincing—the witness is frequently involved in material contradictions; his testimony is not frank and convincing; he frequently remarks in his testimony to the effect that so and so is his business and if he, E. A. Lee, later deems it material he will produce certain evidence. This testimony comes from a man who admits that at a time he owed his father large sums of money, that he handled his father's financial matters, signed his father's name to notes, financial

statements, etc.; knew of these conveyances to his brothers and did not object thereto until his father's death, yet his father lived some eight years after the conveyances and was admittedly competant to handle his own affairs for at least five years after these conveyances were made. Need we say more?

■ ■ The appellee is estopped to attack these conveyances. The facts and circumstances above detailed clearly bring this case within the rule. See Milan Bank v. Richmond, 280 Mo. 30, 217 S. W. 74, 9 A. L. R. 353, 358. We must find and conclude from this record that the appellee was indebted to his father at the time the father deeded the property to the brothers. It was at the instance of the appellee that these deeds were not recorded so that the world might know of these conveyances.

"The neglect of a person to make complaint, or bring suit in due season, he being sui juris and knowing the facts, or having the means of knowledge, is called laches; and where there has been gross laches in prosecuting rights, or long and unreasonable acquiescences in adverse rights, Courts of Equity refuse to interfere, they act either by analogy to the statutes of limitations, or upon their own inherent doctrine of discouraging antiquated demands. The Court realizes the difficulty of doing entire justice, when the original transaction has become obscured by time and the evidence lost, and deems it good public policy to allow claims and titles long acquiesced in to remain in repose. Nevertheless, when there are circumstances excusing or justifying the delay, Courts of Equity will not refuse their aid.

"It has been said that 'nothing can call a Court of Equity into activity but conscience, good faith and reasonable diligence.' The court never lends its aid to one who, with knowledge of his rights and with opportunity

to assert them, delays unreasonably so to do. Equity aids those who are vigilant, not those who sleep upon their rights, and always discourages stale demands. Time, in Equity, is a witness that, what has long been acquiesced in, must originally have been founded on some right. In this respect, it is wholly independent of the statute of limitations. The Court frowns upon attempts to unsettle what has long been at rest, first, because of the difficulty, if not impossibility of making proof; second, because in uprooting an ancient matter, innocent persons are liable to be injured; third, because the defendant, even if originally in the wrong, may, as a result of the complainant's laches, have acquired such affirmative rights that he cannot be placed in statu quo; and fourth, because the delay raises a presumption that originally there was, if not a good defense, at least a better one than now can be made. If a party have knowledge of his rights, his delay will not be excused because of poverty, or want of evidence.'' Gibson's Suits in Chancery, page 87, section 70. We think this doctrine also particularly applicable under the facts and circumstances developed here.

It is very forcefully argued by both the appellant administrator and the appellants holding the deeds in question that the testimony of E. A. Lee given when called by the administrator is incompetent when offered in his behalf because violative of Code section 9780.

The Chancellor held this testimony admissible because E. A. Lee was ''called to testify by the opposite party.'' In support of this holding the chancellor cites Thomas v. Irwin, 90 Tenn. 512, 16 S. W. 1045, and the Code section under which the testimony was objected to.

Certainly in so far as this administrator is concerned this testimony is admissible under the authority

cited by the Chancellor. At the time the witness was called he was a party defendant and also a claimant (his petition filed three days after suit was instituted for funeral expenses) against the estate being administered by the administrator. The testimony on which he later based his claim against the administrator was brought forth on direct examination of the administrator. The administrator certainly cannot complain. This same witness now says there are no assets for the administrator to administer on if the real estate cannot be subjected to his claim. We have heretofore herein held he cannot go back on the real estate.

(6) Clearly under this record the administrator was entitled to appeal on a pauper's oath. He had no assets unless the real estate was subject to be administered on. The motion to dispauperize the administrator was not presented to the Chancellor during the term or within thirty days after it was filed. It was presented to the Chancellor on the first day of the succeeding term. Locke v. Smith Funeral Service Corporation, et al. 180 Tenn. 18, 171 S. W. (2d) 272.

It results that the decree in so far as a judgment is rendered against the administrator is concerned is affirmed but in so far as a lien is declared on the realty in question is concerned it is reversed. The costs of appeal and all costs below in so far as the appellants Pat F. Lee, Thomas O. Lee, J. Brown Lee and Darius Lee are concerned by reason of the petition of E. A. Lee are taxed against E. A. Lee.

Hale and McAmis, JJ., concur.