Nancy E. MURPHY, Appellant,

v.

E. L. EMERY, Jr., et al., Appellees.

Supreme Court of Tennessee.

Dec. 28, 1981.

Order April 5, 1982.

Ted H. Lowe, Jenkins & Jenkins, George E. Penn, II, Jenkins & Jenkins, Knoxville, for appellant.

Frank P. Pinchak, Humphreys, Hutcheson & Moseley, Chattanooga, for appellees.

OPINION

FONES, Justice.

Plaintiff, Nancy Murphy, sued her brother, defendant E. L. Emery, Jr., for breach of duty as a trustee of an inter vivos trust established by their parents. The beneficiaries of the trust are the three children of Mr. and Mrs. E. L. Emery, Sr., plaintiff, defendant, and Mrs. Walker. They were all sui juris when the trust was created in 1965 and at all times relevant to this litigation.

The learned chancellor held that defendant had violated his fiduciary duty by acquiring the real estate upon which the family corporation, Emsco, Inc., erected an of-

fice-warehouse, which building became the property of defendant at the end of a thirteen year lease. The chancellor vested a fifty-five percent interest in the realty and improvements in Emsco, Inc., leaving defendant with a forty-five percent interest, rejected plaintiff's efforts to remove defendant as a trustee of the trust and awarded plaintiff's attorneys a fee of forty-eight thousand dollars to be paid by Emsco, Inc.

The Court of Appeals affirmed the award of an interest in the realty to Emsco, Inc. but held that plaintiff would have to pay her own attorney's fees.

Upon our consideration of both parties' applications for T.R.A.P. 11 appeals, we limited further review to defendants' issue insisting that the suit was barred by the doctrine of laches and plaintiff's issue seeking restoration of attorney's fees against the corporation.

## I.

Mr. and Mrs. Emery, Sr. entered the variety store business in 1927 and by 1963 were the principal owners of a corporation operating a regional chain of stores with headquarters in Knoxville. S. M. Wade owned a minority interest in the corporation. He had been in business with the Emerys since 1935 and in 1963 was President of the corporation, Mr. Emery, Sr. was Chairman of the Board and Mrs. Emery was an officer and director.

The stock structure of the corporation and its ownership is significant. The outstanding stock of the corporation, at all times relevant to this litigation, consisted of fifty shares of voting stock and 19,500 shares of non-voting stock. Both classes of stock shared equally in the equity ownership of the corporation, the right to dividends, etc. At the death of S. M. Wade, in March, 1965, he owned seventeen shares of voting stock and approximately 8,000 shares of non-voting stock and the Emery family owned the remainder.

At the time this case was tried, defendant owned forty-four percent of the stock, plaintiff thirty-three percent and Mrs. Walker twenty-two percent. Mr. and Mrs.

Emery, Sr., conveyed their thirty-three shares of voting stock to the trust when it was established on June 28, 1965, and that stock was the entire res of the trust. The seventeen voting shares owned by the Wade estate were purchased by the corporation and held as treasury stock.

In 1963, defendant owned all of the stock of Emery Stores, Inc., a corporation that owned ten variety stores in Alabama. On July 30, 1963, the Emery, Sr. corporation, based in Knoxville bought all of the stock of the Emery, Jr. corporation for $173,772.00, payable in ten equal annual installments. On the same date, defendant was employed as regional manager of Emery Stores, Inc., for a period of ten years, with a non-competitive clause for that period, at a salary of $13,000 plus two-thirds of the net profits from the operation in Alabama. Those negotiations were principally between S. M. Wade and defendant, but Mr. and Mrs. Emery were involved.

S. M. Wade died in March, 1965, and Mr. and Mrs. Emery, Sr. persuaded defendant to move to Knoxville and take over the operation of the parent corporation. He was elected President of the corporation April 15, 1965.

On June 28, 1965, Mr. and Mrs. Emery, Sr. created a trust naming defendant and the Hamilton National Bank of Knoxville as trustees and their three children, plaintiff, Mrs. Walker and defendant as beneficiaries. As stated above the only property conveyed to the trust was the thirty-three shares of voting stock owned seventeen by Mr. Emery and sixteen by Mrs. Emery, and constituting a controlling interest. The purpose of the trust was stated as follows:

"Whereas, said stock represents the interest or equity which each has in the voting stock of said corporation, in the promotion and management of which they have devoted many years of personal work and attention, and

Whereas, they and each of them desire to relinquish control of the active management of said corporation but desire to continue the management of said corpo-

ration within the family of the trustors, . . ."

Defendant was given the authority to vote the stock for the election of directors and officers of the corporation, without the concurrence of the corporate trustee. The authority to elect officers was ineffective because that function is vested in the directors unless the corporate charter or by-laws provide otherwise. See T.C.A. § 48–811. The minutes of the corporation reflect that the officers were, in fact, elected by the directors.

It is undisputed that when defendant became President, the corporation had two problems that dictated the need for a long-term loan, to-wit, insufficient warehouse space and retail stores that were too small to be competitive. Previous borrowing by the corporation had been limited to ninety day bank loans.

Extended negotiations ultimately resulted in the corporation obtaining a $300,000 loan from Prudential Insurance Company. Prudential required that, (1) defendant subordinate his debt of $121,640, (which, from defendant's viewpoint, would have rendered uncertain the payment of that obligation as scheduled); and (2) that the Alabama contract providing that defendant receive two-thirds of the net profits from those stores, be cancelled.

Defendant was unwilling to subordinate the debt due him but worked out a plan that was acceptable to Prudential and was fully revealed and fully discussed on a number of occasions with all members of the Emery family. The plan involved the following transactions between defendant and the corporation: (1) defendant cancelled the $121,640 balance due him for the Alabama stores. (2) Defendant received (a) 1,700 shares of non-voting stock worth $25,500, (b) a subordinated note in the sum of $39,-204, (c) defendant purchased from the corporation a tract of land it had recently bought to be the site of its warehouse at the same price paid by the corporation, $39,-500, (d) defendant leased the land to the corporation for thirteen years at a rental of $3,600 per annum. The lease agreement required the corporation to erect a building on the property at its own expense and provided that, "all improvements or additions to the premises shall become and be the property of the lessor."

The warehouse was originally projected to cost $105,000 but the initial construction cost was actually $127,004. A later addition cost $80,797. Both lower courts concluded that defendant acquired a building worth $207,801 in return for forgiving $56,936 of the balance owed him by the corporation. ($121,640 minus $25,500 minus $39,204 equals $56,936.) That obviously is an over-simplified analysis that fails to give consideration to such factors as defendant giving up an annual return of principal of $17,736 plus interest that exceeded $6,000 per annum at the time of cancellation, for a cash flow to him of $3,600 per year and deferring the corporation's payment of the principal sum of $39,204 for the life of the loan. However, in our opinion it is too late for the courts to pass upon the fairness of the transaction. This suit was filed more than eleven and one-half years after the lease agreement was entered into between defendant and the corporation.

II.

We are in complete agreement with the principle of law applied by the lower courts, that a trustee cannot acquire trust property or make personal profits out of the trust, without full consent of the beneficiaries, as more fully stated in Gibson's Suits in Chancery, 5th edition, § 55. But, the doctrine of laches applies to an action for breach of trust to the same extent that it applies to any other action in equity, being based upon several equitable principles to-wit: (1) equity never lends its aid to one who, with knowledge of his rights and with opportunities to assert them, delays unreasonably so to do; (2) equity aids those who are vigilant, not those who sleep upon their rights, and always discourages stale demands; (3) time, in equity, is a witness that what has long been acquiesced in must originally have been founded on some right.

We find the statement of the doctrine of laches by Mr. Justice Lansden, writing for the Court in *Evans v. Steele*, 125 Tenn. 483, 145 S.W. 162 (1911) particularly applicable to the facts in this case. We quote the following:

"Relief is generally refused by courts of equity, because of the lapse of time, only in such cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence. *Bolton v. Dickens*, 4 Lea, [569] 577.... The doctrine of laches in courts of equity is not an arbitrary or a technical doctrine. No hard and fast rule for its application can be formulated. But, when the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief. It is not required that the defendant should establish by proof an affirmative injury. It is sufficient if by the laches and delay of complainant it has become doubtful whether the defendant can command the evidence necessary to a fair presentation of the case. Or, if it can be seen that the defendant has been deprived of an advantage he might have had if the complainant's claim had been seasonably presented, a court of equity will not interfere to grant relief." *Id.* at 494–95, 145 S.W. 162.

■ We find that the evidence in this case overwhelmingly supports a finding that the plaintiff knew in 1966 before the plan was consummated that defendant was buying the land, the corporation was constructing the building, and the improvements would become the property of defendant. The settlors of the trust, Mr. and Mrs. Emery were fully informed about the transactions between defendant and the corporation, necessary to obtain the loan and fully approved defendant's ownership of the land and improvements. Mr. and Mrs. Emery were on the Board of Directors of Emsco, Inc. when the transactions took place and continued to serve for several years thereafter. Mr. Emery died on May 6, 1970, and according to Mrs. Walker, retained a vital interest in the affairs of the corporation and was mentally alert until the day of his death. Mrs. Walker also testified that her mother was a very astute business woman and her father never made a business decision without her advice and she likewise retained a vital interest in the affairs of the corporation and was mentally alert until she died.

Plaintiff's delay in bringing this suit has caused defendant to lose the testimony of the settlors. Every indication in this record is that their testimony would have supported and strengthened defendant's contention that both Mr. and Mrs. Murphy were fully informed about every detail and fully approved every phase of the transaction and that, as matters stood in 1965 and 1966, the transactions were fair to the corporation and fully approved by the settlors. We are convinced that by waiting until after the death of the parties' parents to bring this suit, plaintiff has brought this case squarely within the doctrine as stated in *Evans v. Steele, supra.* The injury to defendant is not only that he has been denied evidence that probably would have carried the day on the merits of the breach of trust issue, but that there is no way to turn the clock back and restore him to the position that he could have been placed in by the Court, if plaintiff had brought her lawsuit timely and prevailed.

In 1975, Emsco, Inc. sold to a corporation owned by Mr. and Mrs. Murphy, its South Carolina stores, and upon failure of the purchasers to pay the purchase price, threatened suit. When it became apparent that suit would be filed by Emsco, Inc., plaintiff filed the instant case. It appears that those events precipitated the filing of this suit in September, 1977.

Mrs. Murphy testifying on direct examination at the trial on September 18, 1978, said that she had learned for the first time only one and a half years or two years prior thereto that the Emsco warehouse would become her brother's property in 1979 at the end of the lease term.

Shortly thereafter, on cross examination, Mrs. Murphy admitted that in 1966, her husband had strenuously objected to her brother owning the warehouse, that she and her husband, "had many, many discussions regarding this warehouse," and that her husband resigned as a director of the company because he thought it improper for her brother to own the warehouse.

Mr. Murphy testified several days later. He was asked when he first learned that the warehouse was going to be owned by defendant. He responded that in the early part of 1966 he and his wife met defendant in Memphis where the loan the company was trying to negotiate with Prudential was discussed and defendant told them, "that the company was not going to own the warehouse, but that E. L. Emery, Jr. was going to own it." Mr. Murphy testified that he objected strenuously at that meeting to his brother-in-law owning the realty and acquiring the improvements and that he and his wife had a very uncomfortable trip back to Chicago, because of his objections to the plan that would allow his brother-in-law to acquire the real property and improvements; that his wife's position was that "what her brother was doing was for the good of the company."

Mr. Murphy's testimony continued as follows:

"Q. All right. Did you express any opinion to your wife, following the Memphis meeting, about the subject of E. L. Emery, Jr. intending to own the warehouse?

A. Yes, sir.

Q. What did you tell her?

A. I told her it wasn't right.

Q. Anything else?

A. Absolutely it was completely wrong. It was self-dealing. I could probably refer to it as corporate Mickey Mouse, because that's the way I felt about it. It's a question of somebody that was in a position of power, using that power for their own self-interest.

Q. Did your wife indicate to you whether or not she believed you, didn't believe you, accepted what you said, or not?

A. I got the distinct impression she didn't believe me, and life would be best served, as far as the relationship between my wife and myself, if I backed off. Which, as I said before, is what I did.

Q. On the first occasion when you served on the Board, were you dismissed from the Board, or not re-elected, or did you resign?

A. I resigned.

Q. For what reason?

A. I resigned basically, my personal standpoint was, the reason was because of the warehouse deal. I thought it was wrong, and I didn't want to be involved in the situation."

Plaintiff's testimony that she first learned, about 1976, that her brother would acquire ownership of the warehouse, was false. She did not deny the events surrounding the Memphis meeting described by her husband, a meeting sought by defendant for the express purpose of fully explaining all of the transactions in connection with the Prudential loan.

Mr. Murphy was Chairman of the Executive Committee of the Pullman Bank of Chicago at that time. He testified that defendant sent the loan documents to him for review, comment and advice and that he turned them over to his loan officers and "passed back their reactions to it." In short, there is not one scintilla of credible evidence that all of the details necessary for an understanding of all of the transactions between defendant and the corporation and Prudential were not made available to and discussed with plaintiff and her husband.

In spite of that proof, plaintiff insisted at trial that she never understood the transactions, particularly defendant's acquisition of the real estate and improvements. The chancellor found that it "was a very complex transaction, very hard to understand;" that none of the beneficiaries understood it, "except perhaps Mr. Emery, and I don't know how thoroughly he understood it."

Mr. Murphy, who was unquestionably Mrs. Murphy's agent and business adviser,

as tentatively found by the Court of Appeals, understood the transactions well enough to write the following letter to defendant:

"June 24, 1966

. . . .

As we discussed yesterday on the telephone, you have my complete and unlimited approval to continue your negotiation with Prudential on the basis outlined in their presentation. Not only do you have my approval, old buddy, you have my sincere congratulations for what I consider an excellent job. I have let some of our loan officers look this over and they, too, think that you did good! Keep striving forward—will see you soon. Understand George is on his way to Knoxville, leaving Sunday.

Cordially,

W. R. Murphy"

Mr. Murphy testified that he resigned from the Board of Directors because of his disapproval of defendant's ownership of the realty. However, he deferred that act for approximately three years after the 1966 transactions and gave other reasons for doing so. Later, in 1974, he worked full time for the corporation and received the same salary as defendant.

However, the extent of understanding of the transaction necessary to invoke the doctrine of laches is different from the "most thorough understanding" necessary to sustain a trustee's dealing with a trust. Knowing the facts or having the means of knowledge is the test for the application of laches. *Ledford v. Lee*, 29 Tenn.App. 660, 672, 200 S.W.2d 393 (1946). Gibson's Suits in Chancery, 5th Edition, § 81. Both Mr. and Mrs. Murphy knew the facts or had the means of knowledge of the facts and we find no material credible evidence to the contrary. The fact that defendant was the owner of the realty and the fact, clearly spelled out in the lease between defendant and the corporation, that the corporation would pay for the improvements and they would become the property of defendant, simply cannot be said to be beyond the comprehension of Mrs. Murphy especially in light of the fact that she had the assistance of her banker husband who had a college degree in accounting and extensive business experience. Mrs. Walker testified that she fully understood the transaction in 1966 and she did not join in her sister's suit to set aside the transaction between defendant and the corporation. Her stock and that of defendant represented sixty-six percent of the ownership of the corporation. The Court of Appeals' reversal of the trial court's award of attorney's fees against the corporation was based principally upon the fact that defendant and Mrs. Walker owned two-thirds of the corporation, and we are in accord with the intermediate court on that issue.

The judgment of the Court of Appeals is reversed and this case is dismissed at the cost of plaintiff.

HARBISON, C. J., and COOPER, BROCK and DROWOTA, JJ., concur.

### ORDER

FONES, Justice.

The petition to rehear on behalf of Nancy E. Murphy, et al., merely reargues points already considered by the Court and is respectfully denied. *See* T.R.A.P. 39(a).

HARBISON, C. J., and COOPER, BROCK and DROWOTA, JJ., concur.