JOHNSON v. RECONSTRUCTION FINANCE CORP.

Civ. A. No. 1574.

United States District Court
E. D. Tennessee, S. D.

Sept. 2, 1950.

Corn & Bell, Cleveland, Tenn., Shinn, Grimes, Harlan, Strong & Carson, Washington, D. C., for plaintiff.

Roy A. Miles, Nashville, Tenn., for defendant.

DARR, Chief Judge.

The defendant has interposed a motion to dismiss the complaint. The factual basis of the decision is upon the statements in the complaint and the admissions made by the plaintiff.

Plaintiff sues to recover from the defendant under Section 13 of the Contract Settlement Act of 1944, Public Law 395, 58 Stat. 649, 41 U.S.C.A. § 101 et seq. (herein called the Act), the sum of $136,878.52, claimed as the fair dollar settlement for the cancellation of a war contract between plaintiff and Metals Reserve Company, an authorized subsidiary of the defendant. The items composing the claim are not specified, except by stating that $116,878.52 is the amount of plaintiff's unrecovered cost incident to the contract, and that $20,000 is amount claimed for profits.

The contract was executed September 2, 1942 and called for a sale by the plaintiff and purchase by defendant of 1000 long tons of black manganese oxide ore, to be derived from a designated property in Bradley County, Tennessee. Delivery of the entire amount of ore was required to be completed "no later than 4 months from the date of this contract".

A provision in the contract was "Buyer may cancel all or any uncompleted portions of this contract if seller fails to deliver acceptable ore in accordance with * * *," then follows a specified schedule of deliveries during the four months period.

A further provision was that "notwithstanding any other provisions hereof, buyer in its sole discretion may cancel any or all incompleted portions of this contract if the entire contract quantity has not been delivered by February 15, 1943."

During the life of the contract the plaintiff delivered only 70,000 pounds of ore, for which he was paid the sum of $916.48. The dates of delivery are not shown.

The contract was amended on February 22, 1943, at plaintiff's request to extend the time of delivery to June 30, 1943, but no further deliveries are claimed.

On September 7, 1943, the defendant wrote the following letter to plaintiff:

"Under the captioned contract dated September 2, 1942, covering the proposed purchase by this Company from you of 1,000 tons of manganese ore, the entire quantity was to be delivered no later than June 30, 1943.

"We shall appreciate your advising us promptly the reasons for your failure to complete deliveries within the specified time and whether or not you contemplate making further shipments. Unless we hear from you by September 25, 1943, in this regard we shall presume that you have abandoned the project and shall take such steps as may be necessary to cancel the contract."

Not having heard from plaintiff within the time requested, defendant wrote the plaintiff on October 8, 1943, the following letter as notice of cancellation:

"Under the captioned contract dated September 2, 1942, covering the proposed purchase by this Company from you of 1,000 long tons of manganese ore, delivery was to be made by July 31, 1943.

"Because of your failure to complete deliveries within the time required the captioned contract is hereby cancelled as of the undelivered portion thereof.

"Kindly acknowledge receipt of this notice on the enclosed copy of this letter and return to this office."

Thereafter, on October 17, 1943, plaintiff wrote the defendant that he would be ready to start shipping ore the first of the month, and that if the Government wanted the manganese ore, he would "be glad to have the contract renewed".

The contract, however, was not renewed and nothing further appears to have been done until December 29, 1949, when the plaintiff submitted to defendant a claim "making demand for the reformation of his contract and the award of fair compensation" under the provisions of the Contract Settlement Act of 1944.

In denying the claim the defendant, after reciting the several steps taken in the case—the extension of time granted at plaintiff's request, the plaintiff's apparent indifference as to performance, his failure to answer inquiries implying an abandonment of the contract—the defendant concluded: "It is clear from the foregoing that this contract was terminated because of your default in performance, and consequently you do not have a termination claim under the Contract Settlement Act of 1944, which excludes contracts terminated for default. Your claim, therefore, is hereby denied in its entirety." Thereafter on June 7, 1950, this action was begun.

Defendant's motion to dismiss is upon these grounds:

1. The complaint fails to state a cause of action.

2. The action is barred by the six year statute of limitations of Tennessee.

3 and 4. The complaint shows on its face that plaintiff was in default in the performance of the contract, that the contract by its terms was subject to cancellation and was pursuant thereto canceled for defendant's default, and that plaintiff is entitled to no relief under the Act of Congress relied on because the contract was not canceled or terminated by the government for its convenience or at its option, but for plaintiff's default.

5. Plaintiff has been guilty of such delay and laches in the prosecution of his claim that he is barred or estopped now to assert the same.

6. The complaint does not aver any basis on which plaintiff's claim of $136,-878.52 can be supported; that the averments of the amount expended and the profit claimed are only bare assertions which have no reasonable relation to the cost of production as required by the Congressional Act.

1. The first ground of the motion is general and will be considered in connection with a discussion of the others.

2. The second ground of the motion to dismiss is overruled. The Tennessee Statute of Limitations relied on, Williams Code, section 8600, requires actions of this type to be commenced "within six years after the cause of action accrued." Under sub-section (b) of section 13 of the Act, the action would not accrue until findings on and denial of the claim had been made by the contracting agency. The date of denial and findings was March 6, 1950, and the six year limitation is not applicable.

3 and 4. The third and fourth grounds of the motion to dismiss raise essentially the same question, vis., the propriety and legality of the defendant's declining the plaintiff's claim on the ground of plaintiff's default under the contract.

There is no dispute (1) that the plaintiff had breached the contract when it was canceled; (2) that the contract contained a clear provision for cancellation for default; (3) that the Act under which the suit is brought by section 3(d) excepts

from the provisions of the Act contracts terminated for default of the contractor; and (4) that plaintiff's contract was on October 8, 1943 terminated by the defendant upon the claim of plaintiff's default.

The gravamen of this suit depends upon the interpretation of the word "default". The plaintiff insists that the word as used in the Act was intended to, and should be interpreted as "gross or wilful default". Such default, plaintiff says is not shown in this case and in the absence of gross or wilful default, the plaintiff claims he is entitled to a "fair settlement" for his terminated contract, under the provisions of the Act.

The plaintiff makes claim that the interpretation of the word "dispute" in the Act is guided by prior governmental actions concerning like matters as here litigated. In this respect, plaintiff bases his position on the terms of a "Uniform Termination Article for Fixed Price Supply Prime Contracts", issued by the Joint Contract Termination Board which was established by the Director of War Mobilization on November 12, 1943. Plaintiff also relies on Directive No. 2 issued by the Director of War Mobilization, which provides that contracting agencies will give to holders of existing contracts the earliest practical opportunity to amend their contracts to include the article (Uniform Termination Article, supra) in substitution for any existing provision for termination, etc.

 Suffice it to say that Directive No. 2 (sec. 8002.2 Title 32, Ch. XX, CFR sup. 1944, p. 3057) if informative at all in the light of the subsequent enactments of the Act, expressly excepts its applicability to contracts less than $50,000, and would therefore not affect plaintiff's contract where the amount involved was less than $50,000.00.

 The Uniform Termination Article relied on (May 2, 1944, Title 32, ch. XX, CFR Supp.1944, Part 8002, sec. 8002.1 page 3055) is headed "Termination at the option of the Government", and is therefore not applicable to terminations for "default" as provided in the Act. Furthermore, the provisions for settlement under this article

apply only "if termination of work under (the) contract is simultaneous with, a part of, or in connection with, a general termination (1) of all, or substantially all of a group or class of contracts made by the ——— Department for the same product or for closely related products, or (2) of war contracts at about the time of, or following, the cessation of the present hostilities, or any major part thereof", in which cases it is provided that "such termination shall only be made in accordance with the provisions of this article, unless the contracting officer finds that the contractor is then in gross or wilful default under (the) contract."

None of the conditions set out above apply to the termination of the plaintiff's contract, as there was no general, simultaneous termination of all or substantially all of the group or class of contracts made by the Metals Reserve Company, nor was it at about the time of or following the cessation of the present hostilities. (The date established as the prima facie date for "general termination" of contracts, such as provided for above, was May 8, 1945, VE Day. Appeal Board, proceeding 291—Appeal of Cecil R. Jones, etc.) The cancellation of plaintiff's contract was not in that class. Not only was that true, but as a matter of fact, defendant did not desire cancellation. Its first letter to plaintiff (September 7, 1943) was inquiring whether the plaintiff contemplated making further shipments and advising that in view of the fact that the entire quantity of 1000 tons was to have been delivered no later than June 30, 1943, unless defendant heard from plaintiff by September 25, 1943, defendant would presume that plaintiff had abandoned the project.

The plaintiff did not reply. Under the above conditions defendant was entitled (nothing else appearing) to assume that plaintiff had abandoned the project. The cancellation followed on October 8, 1943.

Instead of this being a termination in line with a general simultaneous termination procedure of all contracts of the group, it was the opposite. It indicated the desire of the government to obtain pro-

duction; and it cannot be doubted that the government was entitled to know definitely what contracts were currently active and a dependable source of supply. Otherwise it was subject to a risk of shortage or oversupply. Plaintiff's contract must be dealt with in relation to the government's other ore-producing contracts and its requirements for manganese ore. As plaintiff declined to inform defendant of his intentions and prospects of delivery a cancellation of his contract was the only means of stabilizing the stock pile requirements.

The "Uniform Termination Article" and the "Directive" issued by the Director of War Mobilization, supra, have no informative value in interpreting the word "dispute" for the reason that neither cover the plaintiff's situation.

■ In addition, the Act itself having superseded any provisions in conflict with it stands for interpretation upon its own language.

■ The Act expressly differentiates between terminations which are "for the convenience or at the option of the Government" (which are covered by the Act) and those which are "for default" of the contractor (which are excluded). The language is plain and unambiguous, and must be given its normal and natural meaning. The Appeal Board, Office of Contract Settlement, announced in proceeding 195, Appeal of Scotia Mining Co., "The act requires the contracting agencies to provide 'fair compensation' for termination only in cases of termination for convenience."

This interpretation seems sound and is the only one that can be justified by the plain language of the Act. The same interpretation was made by the President of the United States in his Veto Message of HR 834 issued on July 11, 1949. HR 834 was an Act to amend the Contract Settlement Act of 1944, Public Law 395, so as to authorize the payment of fair compensation to persons such as plaintiff, contracting to deliver certain strategic and critical metals in cases of failure to recover reasonable costs and for other purposes. The

President, as one of the grounds of his disapproval, said: "The enrolled enactment would reopen the entire contract-settlement program with respect to minerals and metals at a time when that program has been practically completed. The principle of the finality of settlements, which was adopted in the Contract Settlement Act and which experience has demonstrated to be sound, would be abandoned. Contracts *which were canceled because of default by the contractor,* contracts which were completed, contracts which have been approved by the courts would be reopened and new claims could be filed by the contractors. This would add a tremendous administrative burden and expense. Moreover, since the personnel familiar with the metals and minerals program have, for the most part, left the Government, it would be very difficult to protect the Government's interest. It would be especially difficult to ascertain the facts with respect to claims made under section 2." (Emphasis supplied.)

HR 834 was apparently enacted to authorize the payment of claims such as that of plaintiff which could not be approved under the Act. The President's veto thus nullified the effort to legalize such claims.

■ The Court therefore concludes that the plaintiff was in default of his contract and is not entitled to relief under the Act.

5. The fifth ground of defendant's motion to dismiss is based on plaintiff's delay and laches.

The contract was canceled on October 8, 1943; and the only response or steps taken thereafter was plaintiff's letter of October 17, 1943, explaining that he expected to be ready to commence deliveries by the first of the month; and "if you (the defendant) want the manganese ore I will be glad to have the contract renewed".

There was no renewal, and nothing done thereafter by either plaintiff or defendant until December 29, 1949—a period of six years and two months—when plaintiff filed with defendant a claim making demand for the reformation of the contract and the award of fair compensation under the Act. On March 6, 1950, the claim was denied in a letter detailing a history of the contract,

the indulgencies granted by defendant and requests by defendant for production, and final cancellation for plaintiff's default.

The application for an amendment to the contract was based upon the provisions of Section 6(g) of the Act. The defendant's declination thereof was proper, for the reason that the section cannot be interpreted as authorizing an amendment to a contract such as this which the Court has held, supra, was not within the purview of the Act.

As bearing on the plaintiff's delay and laches challenged by the defendant's motion, it is to be noted:

1. One of the expressed objects of the Act was "to assure to prime contractors * * * *speedy* and equitable settlement * * * under terminated war contracts".

2. The regulations issued by RFC and Metals Reserve Company for handling termination settlements under the Act, provided: "Upon receipt of the termination notice the war contractor should notify the party from whom he received the termination notice whether or not he expects to present any termination claim". Title 13 CFR, Part 50, sec. 50.2, p. 1653.

Under the foregoing regulation, the contractor *was required* to give such notice of intention. Monolith Portland M. Co. v. R. F. C., 9 Cir., 178 F.2d 854, 859.

The plaintiff wholly failed to comply with this requirement.

3. On August 7, 1946, Congress passed the Lucas Act, Public Law 657, 79th Congress, U.S.Code Cong.Ser.1946, p. 870, 41 U.S.C.A. § 106 note, providing a broader and more liberal policy for paying contractors' losses on terminated government war contracts, including mining contracts.

The plaintiff failed to avail himself of this law, although he had thus been afforded an opportunity for approximately three years to consider the propriety of making a claim.

The policy of the Congress that claims should be disposed of promptly is indicated by the provision of the Lucas Act that claims thereunder must be filed with the department or agency concerned "within six months after the date of approval of this Act".

4. During the more than six years which the plaintiff has failed to give to the government any notice of claim, or to take any steps to establish such claim, the position of the government has materially changed. As declared by the President in his veto message on HR 834, quoted supra, the handling of claims such as those included in that measure (and such as the plaintiff's claim) "would add a tremendous administrative burden and expense. Moreover, since the personnel familiar with the metals and minerals program have, for the most part, left the Government, it would be very difficult to protect the Government's interest. It would be especially difficult to ascertain the facts with respect to claims made under section 2".

■ The Court is of the opinion that, in view of the plaintiff's long delay in presenting his claim and the unfavorable position resulting to the defendant thereby, the plaintiff is guilty of such delay and laches as should effectually bar his suit. Hays v. Port of Seattle et al., 251 U.S. 233, 40 S.Ct. 125, 64 L.Ed. 243; Gillons v. Shell Co., 9 Cir., 86 F.2d 600, certiorari denied 302 U.S. 689, 58 S.Ct. 9, 82 L.Ed. 532; Lucking v. Schram, 6 Cir., 117 F.2d 160; Evans v. Steele, 125 Tenn. 483, 145 S.W. 162; 30 C.J.S., Equity, §§ 112, 113, pp. 520–523.

6. The question raised by the sixth ground is not of serious import and unnecessary to consider.

For the reasons indicated the motion to dismiss will be sustained.

Order accordingly.