**JOHN P. SAAD & SONS, INC.,**
**Plaintiff-Appellee,**

v.

**NASHVILLE THERMAL TRANSFER**
**CORPORATION,**
**Defendant-Appellant.**

Supreme Court of Tennessee,
at Nashville.

Aug. 11, 1986.

W. Gary Blackburn, Nashville, for plaintiff-appellee. ,

F. Clay Bailey, Jr., Nashville, for defendant-appellant.

OPINION

DROWOTA, Justice.

This case arises from a contract between John P. Saad & Sons, Inc., Plaintiff, and the Nashville Thermal Transfer Corporation, Defendant. The contract was executed in 1973. The issues on appeal concern the application of the doctrine of laches and an alleged breach of contract by Defendant.

Although the facts are disputed, a chronological account of the events surrounding this case is possible. In the early 1970's, the City of Nashville determined that it should design and construct a utility power plant, which would utilize solid wastes as fuel, to heat and cool buildings in the downtown business district. Nashville Thermal Transfer Corporation was formed for this purpose. While the power plant was intended to use solid waste as its primary fuel source, the design accommodated secondary fuel sources to prevent interruption of service to its customers. These secondary fuels were natural gas, supplied by Nashville Gas Company under an interruptible contract,[1] and Number Two diesel fuel oil (No. 2 diesel fuel), which was apparently to be purchased as needed.

During this same period, the City of Nashville was also exploring methods to prevent the improper disposal of "waste oil"[2] in the sewers or in any manner that would damage the environment. To this end, Defendant's consulting engineers concluded that waste oil could be used as a secondary fuel source in the utility's boilers if it could be reprocessed to meet certain specifications approximating the quality of No. 2 diesel fuel. During the design and construction of Defendant's facility, De-

---

1. This contract permitted Nashville Gas Co. to discontinue supply at peak demand periods to allow it to continue to have sufficient gas for other customers; in exchange, Defendant obtained a favorable price for available gas.

2. "Waste oil" is the oil removed from machines or automobiles and contains substantial amounts of impurities and foreign matter, including water, metal shavings, dirt, and whatever else that could become mixed with the oil while being used. Waste oil comes from various sources, but it is primarily taken from vehicle crankcases when the oil is changed.

fendant contacted Plaintiff sometime prior to July, 1972, regarding the possible supply of waste oil for this purpose. Plaintiff submitted its proposal on February 14, 1973. Negotiations followed and on March 16, 1973, Defendant accepted Plaintiff's offer and the "Waste Oil Supply Agreement" was executed by these parties to be effective as of April 1, 1973.

The contract incorporates certain specifications for the reprocessing of the waste oil that Plaintiff was to deliver to Defendant. Among these is the requirement that "[f]uel oil (waste oil) will be settled 30 days in sedimentation to effect sludge separation prior to delivery." Further, the oil delivered was not to contain more than 2% moisture or any free water, requiring that the "effective separation of free water must be made by [Plaintiff] prior to delivery to [Defendant's] facilities." Other specified impurities were also to be minimized or removed by Plaintiff prior to delivery of the waste oil. Plaintiff was to take samples from each delivery to give to Defendant for analysis.

Additional terms and conditions of the contract included an agreement that Plaintiff would assure Defendant "of its ability to perform hereunder, especially as to the large initial gallonage required, by commencing delivery to [Defendant's designated] holding tanks within 5 days of a 45 day notice by [Defendant] of the effective commencement of commercial operations" of the utility plant. The contract also provided for maximum and minimum quantities. The minimum purchase was to be 500,000 gallons per contract year,[3] and "upon 60 days notice, [Plaintiff] will supply ... up to 1,200,000 gallons per Contract year, unless [Defendant] has notified [Plaintiff] in writing one year in advance regarding increases of such maximum use and requirement, which maximum use shall not exceed 1,500,000 gallons per Contract year." The contract contemplated that a year's written

notice would permit Plaintiff to "expand its facilities and supply to enable it to supply such changed maximum use requirements." Plaintiff had informed Defendant of its need to expand its capacity to meet the demand of any requirements in excess of 1.2 million gallons. An integration clause provided that the contract could be modified by the parties only in writing. All notices or demands were to be given in writing as well. The term of the contract was to be 30 years; the agreement could be terminated only by a written notice at least 18 months "prior to the last day of the last contract year." Such a long term contract was intended by the parties to provide Defendant with a secure source of supply and to permit Plaintiff to expand its facilities in a planned manner.

The first delivery of oil under this contract occurred in November, 1973. This oil conformed to the specifications contained in the contract. The total amount of this first order is not clear from the record, but the deliveries commenced on November 15 and ended on November 30. In February, 1974, Defendant commenced initiatory operation of the facility. The first use of solid waste to fuel the plant was in June, 1974. As a result of technical deficiencies in the equipment, the plant's emissions from burning solid waste did not conform to the regulatory standards of the Environmental Protection Agency, and thus Defendant was required to utilize secondary fuel sources while these problems were corrected. Unfortunately, the Arab Oil Embargo, which had been imposed the previous October, 1973, had severely strained available supplies of fuel oil and natural gas.

Although Defendant had not required Plaintiff to make any deliveries under the contract since November of the previous year, in September, 1974, some 9 months after the initial deliveries, the Defendant

---

**3.** Each April 1 commenced a new contract year. We observe that this contract is a requirements contract within the meaning of T.C.A. § 47–2–306. *Cf. Southern Pub. Ass'n. v. Clements Paper Co.,* 139 Tenn. 429, 201 S.W. 745 (1917) (where requirements were limited by minimum and maximum amounts). Nevertheless, application of the Uniform Commercial Code was never raised by these parties. Rule 13(b) T.R.A.P.

resumed ordering waste oil from Plaintiff. Due to Defendant's interruptible supply contract for natural gas and the uncertainty of No. 2 diesel fuel supplies, Defendant began relying more consistently on waste oil for fuel. Demand for Plaintiff's oil became so high that between September, 1974, and February, 1975, significantly more than 500,000 gallons (but far less than the contract maximum) was delivered to Defendant. The overwhelming volume of this waste oil did not conform to the specifications of the contract.

Both Plaintiff and Defendant were fully aware that the waste oil delivered contained substantial amounts of impurities and unseparated water, but it was accepted and used by Defendant without objection. Consequently, the Defendant's boilers were damaged by the use of this unreprocessed waste oil. After February 24, 1975, Defendant never again requested deliveries of oil from Plaintiff. Plaintiff was paid at the contract rate for all the oil delivered. At no time following the last delivery of oil did either party notify the other that the contract had been terminated. From this record, apart from invoices and some correspondence just after the execution of the contract, no writing of any kind was exchanged by these parties from late 1973 until May 31, 1979, when Plaintiff's attorney informed Defendant that an action for an alleged breach of contract was being contemplated. Defendant sent a written termination notice to Plaintiff on April 16, 1980.

The Complaint in this case was filed on February 14, 1980. In its Answer, the Defendant raised the equitable defense of laches, averring that Plaintiff had made no attempt to perform under the contract since 1975. The Answer also alleged that Plaintiff had not been able to perform under the contract. The first trial of this case was held on November 2, 1981. At the conclusion of Plaintiff's proof, the trial court dismissed Plaintiff's case because the proof did not show whether the contract had been assigned to Plaintiff by its predecessor-in-interest, a partnership by the same name. The trial court had previously denied Plaintiff's Motion to Amend the Complaint to reflect the conversion of the partnership to a corporation in June, 1975, with the attendant assignment of the contract to the corporation by the partnership. On appeal, the Court of Appeals reversed and remanded for a new trial because Defendant had made a judicial admission that a contract existed between these parties, and thus the Motion to Amend should have been granted. *John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 642 S.W.2d 151 (Tenn.App.1982).

The second trial of this cause was held on January 30 and 31, 1984. The transcript of the first trial was admitted into evidence; this consisted primarily of the testimony of John Saad, who also testified at the second trial. He testified that at the time of contracting, he did not have sufficient storage capacity to produce the volume of oil called for by the contract, which fact is reflected in the agreement itself. He stated that he accumulated additional capacity by various means, increasing his capacity from some 20,000 gallons in 1971 and 1972 to 100,000 gallons in 1973, and then from 170,000 gallons in 1974 to about 300,000 by 1976. Nevertheless, the actual volume of the storage capacity was never shown by any corroborating evidence (other than John Saad's own testimony) and may have been significantly less. Despite his contention that the rate of orders for oil outpaced his capacity, he never denied that Defendant required more oil than he could have processed during the period from September, 1974, to February, 1975. In addition, John Saad testified that he received a letter, dated April 12, 1973, from Defendant with an attached estimate of the first year's requirements. The monthly quantities ranged greatly, reaching a high of 120,000 gallons a month from December, 1973, through February, 1974.

Evidence also indicates that John Saad did make some attempt to demonstrate an ability to perform on the part of his corporation sometime after February, 1975, although the extent and timing of these efforts are not clear from the record. He

admitted, however, that he never made a written demand of Defendant to take deliveries. While he considered bringing a lawsuit during 1978, he did not do so. Moreover, at the first trial, he testified on cross-examination as follows:

"Q. [Mr. Bailey:] Have you any document or any letter between 1975 and May 30th of 1979 wherein you call on Nashville Thermal to purchase your oil?

A. [Mr. Saad:] No, sir. I didn't fill out anything.

Q. In other words, you went from February of 1975, 1976, 1977, 1978 and they weren't purchasing your oil?

A. That's right.

Q. And it didn't dawn on you during all of that time until May of 1979 that they weren't going to buy your oil, is that correct?

A. No, sir, that's not correct.

Q. Well, you didn't do anything about it other than, as you said, have some conversations with some people?

A. That's right...."

Significantly, Mr. Saad also testified on remand:

"Q. [By Mr. Bailey] Mr. Saad, did you at this time not have the facilities to allow the oil to settle for 30 days, that is, in the fall of 1974?

A. Not for the quantities of oil that the Thermal plant ordered, no, sir."

Furthermore, despite the corporation's concern that Defendant was not ordering any oil, as reflected on the minutes of the 1976 Annual Stockholders Meeting (held May 10, 1976) and of the 1977 Annual Stockholders Meeting (held May 26, 1977), Plaintiff failed to take any positive steps to assert its contractual rights by giving a written notice as required by the terms of the contract itself. A number of other witnesses (eight other than Mr. Saad) testified in person or by deposition, but their testimony is not summarized here; however, we note that all of the testimony given in this case is peppered with numerous lapses of memory concerning the details of these events.

In his short Memorandum Opinion of May 21, 1984, Judge Everett ruled that Plaintiff's action was dismissed, finding that Plaintiff had breached the contract by failing to supply conforming oil and that Plaintiff was estopped by the doctrine of laches from maintaining this action. He found that Plaintiff had acquiesced in the termination of the contract when it did not deliver any oil that complied with the terms and conditions of the contract after the last deliveries in February, 1975. On appeal for the second time, the Court of Appeals reversed and remanded the case for a new trial, ruling that laches was inapplicable unless the passage of time resulted in prejudice to the Defendant's defense; the intermediate court resolved the case on issues not addressed here. Defendant's Application for Permission to Appeal was granted by this Court. We now reverse the Court of Appeals and reinstate the judgment of the trial court.

Both of the trials in this case were without juries. The trial court made no extensive or explicit findings of fact and the Court of Appeals did not make any concurrent findings of fact. "Where the trial judge and the Court of Appeals differ in their respective findings and conclusions of facts upon the oral evidence, this Court is obligated to review such evidence *de novo*, but with the presumption that the trial court's decision was correct unless the evidence preponderates against it." *Maryville Lumber Co. v. Robinson*, 216 Tenn. 184, 189, 391 S.W.2d 624, 626–627 (1965) (citations omitted). *See* Rule 13(d), T.R. A.P. *See also, e.g., Bank of Ripley v. Sadler*, 671 S.W.2d 454, 458 (Tenn.1984); *Shrum v. Powell*, 604 S.W.2d 869, 871 (Tenn.App.), *cert. denied* (Tenn.1980); *City of Mason v. Banks*, 581 S.W.2d 621, 624 (Tenn.1979).

■ In our opinion, the testimony of John Saad is sufficient to support the conclusion of the trial court that the doctrine of laches should apply to bar this action. The record does not demonstrate that

Plaintiff rigorously pursued its rights under the contract; rather, the extent of the efforts made by Plaintiff in this regard is unclear and none of these attempts was ever recorded in writing either as a demand that Defendant should resume ordering waste oil or as a notice that Plaintiff was ready and willing to perform under the contract.

"The seller ... by its continued and consistent course of conduct in tendering acid due under the contract, requesting shipping instructions therefor, and repeated notifications to the buyer of the latter's existing obligation under the contract, had kept the same in force and binding upon both parties...."

*Tennessee Fertilizer Co. v. International Agr. Corp.*, 146 Tenn. 451, 461, 243 S.W. 81, 84 (1921). Neither party contends that any written notices or demands were exchanged before 1979. The contract requires that the transactions be conducted in writing, stating specifically that "[a]ny notices or demands which *may or must* be given by either party to the other hereunder shall be made in writing...." (emphasis added) Moreover, Mr. Saad testified that while his corporation was concerned that Defendant was not ordering oil at its 1976 and 1977 Annual Stockholders Meetings and that no oil had been ordered since February, 1975, no written notice or demand was served upon Defendant. As previously noted as well, he also considered bringing suit sometime during 1978 but failed to do so. The first written notice of any kind was a letter dated May 31, 1979, to Defendant—over four years after the last delivery of oil. Whatever oral communications were had between these parties have now been obscured by time, especially considering that a number of the witnesses can no longer recall many of the crucial details surrounding these transactions.

As the Court of Appeals noted in *American National Insurance Co. v. McPhetridge*, 28 Tenn.App. 145, 187 S.W.2d 640, *cert. denied* (Tenn.1945), "[t]he doctrine of laches was very aptly stated ... in *Evans v. Steele*, 125 Tenn. 483, 494, 495, 145 S.W. 162, 165, as follows:

'Relief is generally refused by courts of equity, because of lapse of time, only in such cases where the loss of evidence, death of witnesses or parties, and *failure of memory* resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence ... The doctrine of laches :... is not an arbitrary or technical doctrine. No hard and fast rule for its application can be formulated.'"

187 S.W.2d at 643 (emphasis added). The application of the doctrine in the first instance lies within the discretion of the trial court and it will not be reversed except upon a showing of an abuse of discretion. *Hannewald v. Fairfield Communities, Inc.*, 651 S.W.2d 222, 228 (Tenn.App.), *permission to appeal denied* (Tenn.1983). Such application "depends upon the equities at stake in each individual case, and in the present suit, we feel that the practical realities of the situation allow its application." *Id.* See also *State ex rel. Wilson v. Mays*, 190 Tenn. 156, 162, 228 S.W.2d 97, 100 (Tenn.1950).

" 'The neglect of a person to make complaint, or bring suit in due season, he being sui juris and knowing the facts, or having the means of knowledge, is called laches; and where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in adverse rights, Courts of Equity refuse to interfere, they act either by analogy to the statutes of limitations, or upon their own inherent doctrine of discouraging antiquated demands. The Court realizes the difficulty of doing entire justice, when the original transaction has become obscured by time and the evidence lost, and deems it good public policy to allow claims and titles long acquiesced in to remain in repose.' "

*Ledford v. Lee*, 29 Tenn.App. 660, 200 S.W.2d 393, 398 (1946), *cert. denied* (Tenn. 1947) (Quoting Gibson's Suits in Chancery, § 70, p. 87).

We think that the trial court was justified in dismissing this action on the basis of laches. Furthermore, the Uniform Commercial Code explicitly provides that "[u]nless displaced by the particular provisions of ... this title, the principles of law and equity ... shall supplement its provisions." T.C.A. § 47–1–103. *Cf. Moore v. Howard Pontiac-American, Inc.*, 492 S.W.2d 227, 230 (Tenn.App.1972), *cert. denied* (Tenn.1973) (Where the court supplemented the remedies provided by the Code with those found at common law, citing this provision). This record also reveals that Defendant found it difficult to establish its defense that Plaintiff had never been able to perform under the contract because it lacked the capacity to settle and process sufficient quantities of oil; this defense was hindered by the failure of Plaintiff to produce sufficient evidence of its storage capacity.[4] In his testimony, Mr. Saad conceded that, aside from his own statements, he had no records, contracts, leases, or other evidence to show that he in fact had adequate storage capacity to supply Defendant's requirements.

▪ In this regard, Plaintiff was required to show that he was able to perform the contract as part of his burden of proof before he would have been allowed to recover for any breach by Defendant. Defendant specifically denied that Plaintiff had this capacity in its Answer to the Complaint. This record does not demonstrate such an ability to perform and the evidence does not clearly preponderate in Plaintiff's favor on this issue. On the contrary, the record shows that Plaintiff had about nine months between the initial deliveries of oil in 1973 and the deliveries that commenced in September, 1974, when Mr. Saad claims to have had between 100,000 and 170,000 gallons of capacity, but Plaintiff was not

able to deliver oil conforming to the contract between September, 1974, and February, 1975. Under the contract as written, Plaintiff was to be prepared to deliver waste oil as required by Defendant. Plaintiff admitted receiving Defendant's letter of April 12, 1973, which estimated its oil requirements at 40,000 gallons per month from September, 1974, through January, 1975.[5] The contract also required Plaintiff to assure Defendant of its ability to perform. Without any showing of a realistic ability to settle and process sufficient quantities of oil to meet Defendant's estimated demand, or at least the minimum contract requirement, Plaintiff cannot successfully maintain an action for breach of the contract against Defendant. "[T]here can be no recovery for damages on the theory of breach of contract by the party who himself breached the contract." *Santa Barbara Capital Corp. v. World Christian Radio Foundation, Inc.*, 491 S.W.2d 852, 857 (Tenn.App.1972), *cert. denied* (Tenn.1973). *Cf.* T.C.A. § 47–2–503 (Manner of seller's tender of delivery); T.C.A. § 47–2–507 (Effect of seller's tender).

▪ The fact that Defendant accepted nonconforming oil during the period from September, 1974, to February, 1975, does not relieve Plaintiff of its obligations to perform the contract as to future deliveries.[6]

" 'Where ... goods sold are delivered in installments, the acceptance of an installment which does not comply with the requirements of the contract is not a waiver of the [buyer's] right to reject subsequent installments, which also fail to comply with such requirement; but he is not entitled, after such acceptance, to refuse to accept the residue of the goods

---

**4.** Plaintiff did answer Defendant's interrogatories on this question but never supplied any evidence apart from a bald assertion that it had the capacity necessary to perform.

**5.** The total estimated requirements for the first contract year was well in excess of the 500,000 gallon contract minimum, but it did not approach the 1.2 million gallon maximum.

**6.** The trial court particularly found that following the last delivery of oil in 1975, "the plaintiffs ... chose not to deliver any oil and comply with the contract as specified in the original contract."

unless they also fail to comply with the contract....'"

*John Deer Plow Co. v. Shellabarger,* 140 Tenn. 123, 130, 203 S.W. 756, 757 (1918). (Citation omitted). Not only did Plaintiff not attempt to perform the contract again following the last delivery of oil in February, 1975, but Plaintiff did not assert any contractual right to perform or serve written demand upon Defendant that Defendant was still obligated to take deliveries under the contract. Nor did Plaintiff demonstrate that it had the capacity to deliver even the minimum requirements contemplated by the agreement. Whether Defendant breached the contract in failing to order waste oil as provided by the contract cannot, therefore, be addressed on this record.

Accordingly, we reverse the judgment of the Court of Appeals and reinstate the judgment of the trial court, applying the presumption of correctness, as we are unable to conclude that the evidence in this record preponderates against the conclusions of the trial court. Rule 13(d), T.R. A.P. The case is dismissed, with costs taxed to the Appellee.

BROCK, C.J., and FONES, HARBISON and COOPER, JJ., concur.