IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 29, 2012 Session

## MARTHA R. SCENT  v. CHESTER SHOEMAKER ET AL.

**Appeal from the Circuit Court for Scott County**
**No. 7605      John D. McAfee, Judge**

--------

**No. E2011-02711-COA-R3-CV-FILED-NOVEMBER 29, 2012**

--------

Martha Scent filed a declaratory judgment action against multiple defendants to establish her rights with respect to a deed of trust that granted her a lien on a tract of land.  In addition, Scent sought to establish that "her" signature on a release of her deed of trust is a forgery. The trial court granted Scent partial summary judgment voiding and nullifying the release of her trust deed.  The case proceeded to a bench trial with the focus on the priority of trust deeds as between Scent and the defendant Ellen W. Hood.  Based upon the application of the doctrine of merger, the court ruled that Scent held the priority position.  The court awarded judgment in her favor and Hood appeals.[1]  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

James W. Brooks, Jr., Wartburg, Tennessee, for the appellant, Ellen W. Hood.

Ernest A. Petroff and Stephen A. Marcum, Huntsville, Tennessee, for the appellee, Martha R. Scent.

**OPINION**

--------

[1]The record indicates that there are multiple counterclaims and cross-claims pending among various of the more than twenty original parties; however, these claims have not yet been heard in the trial court and are not a subject of this appeal.

I.

The focus of this litigation is on a 40 plus acre tract of land ("the Property") lying along New River in Scott County. In 2001, the Property was owned by the defendant Chester Shoemaker. It had been passed down over the years through his family. On September 11, 2001, Shoemaker mortgaged the Property to Community Bank of the Cumberlands ("the Bank") as security for a $150,000 loan to an entity known as West FRK 2, LLC. As one of the counsel at trial put it, this is "where the story starts." The proof in the record amounts to a painstaking, chronological review of the "not uncomplicated series of transactions" that followed.

Although Shoemaker was the owner of the Property, the September 11, 2001, deed of trust purported to convey the Property from West FRK 2 to Don Calcote, the Bank's trustee; it was signed on behalf of the company by Shoemaker and Stuart Thomas Hood, another defendant, but did not identify Shoemaker as the grantor of the Property.

On October 23, 2001, Shoemaker executed a second deed of trust securing a note to the plaintiff Scent evidencing a $150,000 loan from Scent to Lone Mountain, Inc., a company in which Shoemaker was a principal. On this deed of trust, Shoemaker was reflected as the grantor. It makes specific reference to the September 11, 2001, trust deed.

On November 5, 2001, Lone Mountain, acting through the signature of its principal, Shoemaker, issued a convertible debenture to Scent, which recites a promise to pay Scent $150,000 with interest at 8% per annum. The debenture would automatically convert to a 20% ownership in the common stock of Lone Mountain in two years or upon repayment of $120,000 of the principal loan amount, whichever occurred first, unless Scent notified the corporation that she did not intend to convert. Scent was granted the right, at any time, to declare all obligations under the note immediately due and payable. In addition to the note/convertible debenture, Scent's loan to Lone Mountain was secured by personal guaranties executed by Shoemaker and others.

On June 4, 2002, a corrected deed of trust was filed with respect to the September 11, 2001, instrument for the purpose of inserting Shoemaker as the owner of the Property in the granting clause. By this time, the Lone Mountain project was failing and Shoemaker was in default on his September 11, 2001 obligation to the Bank. On June 20, 2002, the Bank and Shoemaker entered into an agreement whereby the Bank agreed to accept a deed to the Property in satisfaction of the debt, but subject to a condition, *i.e.*, that the Bank could obtain clear title to the Property. On July 23, 2002, the Bank and Shoemaker executed the deed in lieu of foreclosure as agreed. The deed in lieu of foreclosure recites that the Bank, in return for Shoemaker's conveyance of the Property, "has agreed to accept[] this conveyance in

-2-

return for full and complete satisfaction of [its] promissory note and the release of [its] Deed of Trust."

In October 2002, Scent, through her Kentucky counsel, sent written notification to Lone Mountain and Shoemaker that she would not be exercising her option to take an ownership interest in the corporation. Instead, Scent declared Lone Mountain in default on its obligation and declared the entire sum of $161,301.66 – representing the principal, interest, plus fees, costs, and attorney fees – due and payable within 10 days. According to Scent, "discussions" and "negotiations" between the Bank and her attorneys began in which the Bank made continuing efforts to either sell the Property to her or obtain the release of her deed of trust. Scent declined the Bank's entreaties and the Bank turned its attention to defendant Ellen W. Hood, one of several individuals obligated to the Bank on its loan to Shoemaker.

On November 5, 2004, the Bank assigned to Hood the September 11, 2001, trust deed together with the note it secured, as well as any of the Bank's other rights in the Property. As reflected in this "Assignment of Deed of Trust and Note," the unpaid balance of the note with interest and fees was then $231,951.09. Nearly four months later, on March 30, 2005, the Bank executed a quitclaim deed to the Property to Hood. Obviously, the quitclaim was made without warranty of title. It did not reference Scent's trust deed. The quitclaim deed provides that the source of the Bank's equitable interest in the Property is "a Deed in Lieu of Foreclosure from . . . Shoemaker to . . . Bank . . . ."

In February 2006, Hood gave her son, Stuart Thomas Hood, also a defendant in the present case, a limited power of attorney for the purpose of handling the sale of the Property on her behalf. In March 2006, a "signed" release of Scent's trust deed was recorded. Subsequently, Hood effectuated the subdivision of the Property and numerous sales to various buyers, some of whom later constructed homes on their lots.[2]

On December 31, 2008, Scent filed this action against Shoemaker, Ms. Hood, her son, the Bank, and numerous other defendants seeking (1) to remove the release of her trust deed on the basis that her signature was forged; (2) a declaration of her rights with respect to the Property under the October 23, 2001, deed of trust; and (3) authorization to enable the successor trustee to foreclose on Scent's trust deed.[3] More specifically, as to her trust deed,

_____

[2]The property owners were joined as parties in the present case in order to permit the adjudication of their rights and interests during this litigation.

[3]Scent filed an amended complaint to add additional defendants on September 28, 2009. Only the
(continued...)

-3-

Scent sought a declaration that she held "a first and superior lien on the . . . [P]roperty conveyed to . . . Hood from . . . [Bank] [by quitclaim deed] on March 30, 2005, and all conveyances of the [Property] to or from . . . Hood are subject to [Scent's] first and superior lien. . . ."

At trial, Scent was the only witness to testify in person. Scent, who is a Kentucky resident, explained that her son lived in Knoxville and was a business partner of Shoemaker. Her son presented to her information about Lone Mountain, Inc., a coal mining project, and she decided to invest $150,000 "in return for the promise of a lien" on the Property. Scent never personally came to Tennessee to see the Property and did not conduct a title search before investing in the project. She was not aware of any other liens on the Property or the priority standing of her deed of trust. She sent the money to her son and, since she was out of state, relied upon him to handle the paperwork and other details of the transaction. She reiterated that, in addition to a deed of trust, her investment was secured by a convertible debenture and continuing guaranties.

Scent recalled that, in 2002, her son advised that Shoemaker had approached him about the Bank's desire that she release her lien. Then, the Bank began "rather aggressive activity of trying to get [her] to release [her] lien." On the advice of her Kentucky counsel, she declined. She said that, for more than a year, "lengthy" discussions with the Bank followed and she rejected the Bank's proposals to obtain her release. Scent said because "the [B]ank was negotiating with [her] like they felt they had first lien" on the Property, she was under the impression that she held a second lien. Eventually, communications with the Bank simply ended.

In 2005, Scent began considering a foreclosure of her trust deed. She "got busy" retaining counsel in Tennessee to perform a title search. As a result of the search, she learned that the Bank "had filed a defective first lien"; she assumed, from the "defectiveness" of the September 11, 2001, trust deed, that her lien had first priority. According to Scent, she first became aware of a potential issue regarding her lien in August 2008 when she decided to foreclose. At that time, a "realtor friend" advised Scent's son that he had heard that the property was already being sold and developed. In investigating the status of her lien at the courthouse that same day, Scent discovered that a "release" of her lien had been filed in the Register of Deeds' office, prompting her to hire her current attorneys to handle the matter. By her calculations, she had incurred damages with respect to the lien as of the trial date,

[3](...continued)
amended complaint is before us, but there appears to be no dispute as to the filing of the original complaint.

-4-

including interest on the initial $150,000 plus attorney fees and expenses, totaling nearly $397,000.

Prior to trial, the court granted Scent a partial summary judgment with respect to that portion of her complaint alleging that the signature on the release of her trust deed was a forgery. The trial court declared the release null and void. As a result, Scent proceeded to trial regarding the priority status of her lien. In the course of the October 2011 bench trial, the court rejected Scent's argument that her trust deed gave her a first priority position. She had premised her position on the argument that the September 11, 2001, trust deed was defective in that it failed to identify Shoemaker as the grantor and that the correction trust deed came after hers. The trial court held that the Bank's "defective" September 11, 2001, deed of trust was "cured" by the June 4, 2002, correction deed and that it took priority over Scent's October 23, 2001, trust deed because Scent's trust deed was given with constructive notice of the earlier trust deed. As the trial court phrased it, the remaining, dispositive issue became: "Did the [B]ank, by taking the deed in lieu of foreclosure, basically cause the deed of trust of [September 11, 2001] to just disappear," thereby putting [Scent's October 23, 2001, deed of trust] in the number one slot . . .?" The trial court determined that the answer was "yes."

At the close of the hearing, the court rejected Hood's defense of laches as inapplicable. The court granted Scent's request to proceed to a judicial foreclosure "with the understanding" that such foreclosure would not take place pending the time for taking an appeal, or disposition of an appeal by any party. Lastly, the court awarded Scent a judgment against Shoemaker in the amount of $269,000.00 ($150,000 plus interest of $119,000), plus an additional $75,000 for costs and attorney fees. Hood's timely-filed notice of appeal followed.

II.

Hood presents the following issues for our review:

> 1. Did the Trial Court err when it extinguished the first priority Deed of Trust assigned to and held by [Hood], by incorrectly applying the doctrine of merger of title in this case?

> 2. Did the Trial Court err in holding that the claim of [Scent] was not barred by the equitable doctrine of laches?

III.

Our review of this bench trial is de novo upon the record of the proceedings below, but the record comes to us accompanied by a presumption of correctness as to the trial court's factual findings – a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). Our review of the trial court's conclusions of law is also de novo but with no presumption of correctness attaching to the trial court's legal conclusions of law. ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997).

A second standard of review is also applicable in the present case – whether the application of the doctrine of laches lies within the discretion of the trial court such as to bring into play the abuse of discretion standard. ***John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.***, 715 S.W.2d 41, 46 (Tenn. 1986). Stated another way, the "application of the doctrine in the first instance lies within the discretion of the trial court and it will not be reversed except upon a showing of an abuse of discretion." ***Hannewald v. Fairfield Communities, Inc.***, 651 S.W.2d 222, 228 (Tenn. Ct. App.), *perm. app. denied* (Tenn. 1983).

IV.

Hood argues that the trial court, after first holding that she held a first priority lien on the Property, erred when it further held that her lien became unenforceable when the Bank accepted a deed from Shoemaker in lieu of foreclosure. With little elaboration, Hood submits that "Shoemaker conveyed away a portion or all of his interest in the [Property] prior to execution of the Deed in Lieu of Foreclosure" and, in this manner, she reasons, the "Deed of Trust executed by . . . Shoemaker in favor of [Scent] . . . prevented a merger of the legal and equitable titles."

We quote pertinent portions of the trial court's final judgment:

> [T]he Deed of Trust . . . dated October [23], 2001,[4] asserted by
> . . . Scent . . . was subordinate to the Deed of Trust . . . dated
> September 11, 2001, . . . as subsequently corrected by
> Correction Deed of Trust dated June 4, 2002.

---

[4]The trial court refers to the date of the Deed as "October 10, 200l." The deed is included in the record before us and reflects that it was signed and recorded on October 23, 2001. Accordingly, we use the latter date throughout this opinion.

[B]y the acceptance and recording of that Deed in Lieu of Foreclosure from . . . Shoemaker to . . . [the Bank], dated July 23, 2002, . . . [the Bank] released and fully discharged the Deed of Trust . . . dated September 11, 2001 and June 4, 2002.

[T]he Deed of Trust . . . dated October [23], 2001, asserted by . . . Scent . . . is now the first and superior lien upon the . . . [P]roperty of . . . Hood. . . .

Simply stated, Hood asserts that the trial court erred "by concluding that the lien was extinguished by applying the doctrine of merger to this transaction between . . . Bank and . . . Shoemaker." Scent responds that the trial court correctly applied the doctrine of merger to extinguish the Bank's lien based on Shoemaker's conveyance of the Property via deed in lieu of foreclosure.

The trial court elaborated its "legal rulings" regarding the deed in lieu of foreclosure, in pertinent part, as follows:

[I]n fact, the 7/23/02 deed in lieu of foreclosure has expressly done away with the deed of trust of 9/11/01; therefore, the assignment of that purported deed of trust of 9/11/01 [to Hood] is in vain, because there was nothing to assign. That was basically given up. When . . . the [B]ank was operating with Mr. Shoemaker, the [B]ank expressly gave that away.

\* \* \*

[The Bank] gave it up. They were the holder. They basically were the holder of a deed of trust. They had a deed of trust that was number one. It was in the first slot. I've ruled on that. They had the first slot, and they had a superior right over . . . Scent at that time.

Then when they were negotiating with . . . Shoemaker, . . . Shoemaker said, I'll just give you the property back.

And so in lieu of foreclosure, they expressly gave and waived their rights under that deed of trust. [ . . . ] [A]nd I'm specifically ruling that because I think that's what, in fact, the 7/23/02 document says.

To summarize, as relevant to the issue before us, the trial court held that the July 23, 2002, deed in lieu of foreclosure "expressly [did] away with" the September 11, 2001, deed of trust, which to that point had a first priority, so that the Bank gave nothing to Hood on November 5, 2004, because it had nothing left to give. At that point, Scent's deed was the only one remaining, thus, it moved into the "first slot" and took priority.

This Court has applied the doctrine of merger "to discharge a mortgage lien where the mortgagors conveyed the mortgaged property to the mortgagee." *See Sanders v. Lackey*, 59 Tenn. App. 207, 439 S.W.2d 610 (1969). Stated differently, "[o]rdinarily the purchase or acquisition of the equity of redemption in mortgaged premises by the mortgagee results in a merger of the two estates, vesting the mortgagee with the complete title, and putting an end to his rights or title under the mortgage." *Patterson v. Turner*, No. 01A01-9007-CH-00267, 1990 WL 207413, at *2-4 (Tenn. App. Dec. 19, 1990) (citing 59 C.J.S. Mortgages § 437).

In *Patterson*, this Court cited the following statements regarding the doctrine of merger:

> Merger does not always or necessarily follow, however, at least in equity, from a conveyance of the land to the mortgagee; a merger of the fee or equity of redemption with the interest of the mortgagee is not favored and will not be allowed where it would work injustice or violate well-established principles of equity, or, as discussed infra § 440, where contrary to the intention of the parties; and where there has been no merger the holder of the mortgage may maintain an action to foreclose it even though he holds a deed to the mortgaged premises.

> \* \* \*

> In the final analysis, whether or not the conveyance of property covered by a mortgage to the holder of the mortgage operates as a merger depends on the facts and circumstances of the particular case.

> \* \* \*

> In order to constitute a merger, the two estates or interests must unite in the same person in the same right, and the interest acquired must be the entire estate or the complete legal title in fee, unencumbered with conditions or restrictive agreements,

and not liable to be defeated because of fraud or undue influence or on other grounds.

In section 440 of the same article is found the following text:

The question whether a conveyance of the equity to the mortgagee results in a merger of the mortgage and fee is primarily one of intention of the parties, particularly, according to the decisions on the question, the intention of the mortgagee, for the mortgagee has an election in equity to prevent a merger and keep the mortgage alive. According to some authorities, the intention at the time of the alleged merger or coming together of the two estates is the controlling factor; but it has also been considered that the question whether or not the estates merged is not necessarily to be determined as of the moment when they came into the possession of the mortgagee, and that the mortgagee may prevent a merger and keep the mortgage alive even though he does not indicate his intention for a long time after the conveyance of the equity to him and not until another is about to acquire from him an interest in one of those estates.

* * *

The intention of the parties on the question of merger may be expressly declared, or it may appear from the conduct of the parties, the circumstances of the transaction, and the particular equities of the case. In any event, however, the intention to merge must be clear.

In section 441 of the same article is found the following text:

Ordinarily a merger will not be held to result where a denial of a merger is necessary to protect the interests of the mortgagee, the presumption being, in the absence of proof to the contrary, that he intended what would best accord with his interests.

* * *

A mortgagee acquiring the equity of redemption has the right to keep his mortgage alive as a protection against intervening liens

or encumbrances. Thus, in the absence of an intent to effect a merger, no merger will result from the mortgagee's acquisition of the equity of redemption if the continued existence of the mortgage is necessary to enable the mortgagee to defend his rights against intervening liens of third persons, or if there is nothing to rebut the presumption that his intention corresponded with his interest; and particularly where he was ignorant of the existence of such intervening liens or encumbrances a merger will be prevented. At least, in such cases, an intent not to merge will be presumed.

*Id.* at *3 (quoting 59 C.J.S. Mortgages §§ 440 and 441).

To further assist our consideration of the merger issue in the present case, we turn to a most instructive discussion and analysis of the doctrine as set forth in ***Whipple v. Commercial Bank of Blue Hill***, 572 N.W.2d 797, 801-803(Neb. Ct. App. 1997), also involving a dispute over the priority of liens between the senior and junior lienholders evidenced by deeds of trust. To begin, the Nebraska Court of Appeals observed that "[i]f an instrument is intended by the parties to be security for a debt, it is in equity, without regard to its form or name, a mortgage." *Id*. at 800. Accordingly, mortgage law was applied. We quote extensively from the ***Whipple*** Court's opinion:

The merger doctrine, as applied to mortgages, has generally been described as follows:

Ordinarily, a transfer of the interest of the mortgagor in mortgaged property to the mortgagee operates as a merger of the two estates, which effects a discharge of the mortgage and satisfaction of the debt . . . . This rule, however, is subject to exceptions, and courts of equity will not follow it where justice requires the lien to be preserved in order to protect a right.

55 *Am. Jur. 2d Mortgages* § 1340 at 734 (1996).

General authority recognizes that the question of merger is primarily a question of intention and that merger will not take place where there is an intention to keep the mortgage alive or, in the absence of a showing of an intention to the contrary,

-10-

where the mortgage is necessary to protect the mortgagee from intervening claims or liens of third persons. *Id*., §§ 1342 and 1345.

> In this regard, it has been held that an intent to effect a merger is indicated where, after acquiring the equity, the mortgagee conveys the property to an unrelated party, constituting convincing evidence that the mortgagee intended to effect a merger so that the complete fee then could be transferred to the third party.

*Id*., § 1345 at 737-38.

General authority further recognizes that the conveyance of the mortgaged property to the mortgagee in satisfaction of the mortgage debt does not necessarily operate as a merger when the mortgagee is ignorant of the junior lien. "A different result has, however, been reached where the mortgage was discharged with knowledge of the intervening lien . . . ." 55 *Am. Jur.* 2d, supra, § 1350 at 741.

*   *   *

In contrast to these well-established propositions, the drafters of the Restatement (Third) of Property § 8.5 (1997) have concluded that the merger doctrine is inapplicable to mortgages. At the same time, however, the drafters have recognized that courts continue to apply the doctrine in this context:

> As applied in the mortgage setting, the theory holds that when a mortgagee's interest and a fee title become owned by the same person, the lesser estate, the mortgage, merges into the greater, the fee, and is extinguished unless the holder intends a contrary result. This extension of the merger principle has created one of the most complex, confusing, and frequently litigated areas of mortgage law.

*Id*., § 8.5, comment a. at 608. The case at hand is an example of that complexity.

The drafters of the Restatement present the reader with two illustrations that resolve the issues presented in the instant case without resorting to the merger doctrine. *See Id*., § 8.5, comment b., illustrations 1 and 6. The basic facts underlying both illustrations are that the senior of two mortgagees takes a deed to the mortgaged property from the mortgagor in exchange for which the senior mortgagee releases the mortgagor from liability. In the illustration where the senior mortgagee had no knowledge of the second or intervening lien at the time of the release, the senior mortgagee could foreclose on the property. However, as in the illustration noted, where the senior mortgagee did have knowledge of the intervening lien at the time of the release, the senior mortgagee could not foreclose on the property.

Clearly, the decisive factor was the senior mortgagee's knowledge of intervening liens at the time it accepted the deed and released the mortgagor. It was also the decisive factor in *Edney v. Jensen*, 116 Neb. 242, 216 N.W. 812 (1927), and *First State Savings Bank v. Martin*, supra, although it was decided in the context of the merger doctrine. In *Edney*, the senior mortgagee, who had two mortgages on certain property, took a deed to that land from the mortgagor and, in exchange, executed releases of the two mortgages. Unbeknownst to the senior mortgagee, the mortgagor had given a mortgage on the same property to a third party. After discovering the third party's mortgage, the senior mortgagee brought suit to foreclose his two mortgages. The trial court found that the senior mortgagee had no knowledge of the third party's mortgage when he executed the releases, and consequently, it granted the senior mortgagee's petition of foreclosure. In affirming the trial court's judgment, the Nebraska Supreme Court stated that the only factual question of consequence was whether the senior mortgagee had actual knowledge of the third party's mortgage at the time that he consummated the settlement with the mortgagor. The *Edney* court resolved that fact question in favor of the senior mortgagee.

-12-

In ***First State Savings Bank v. Martin***, supra, the bank took a deed in satisfaction of a mortgage, but the abstractor it hired to check the title failed to discover a judgment that was an intervening lien. After so discovering, the bank filed an action for reinstatement of its lien and then for foreclosure. The judgment holder argued that the bank was negligent in not learning of the judgment lien. The Nebraska Supreme Court rejected that argument and held that the bank's lack of actual knowledge was sufficient. The court concluded that the bank had discharged its lien under a mistake of fact--that the intention of the bank was not to subject its lien to the lien of the judgment creditor. Thus, the court affirmed the trial court's order reinstating the lien and decreeing foreclosure.

We have found no cases where the senior mortgagee was found to have had actual knowledge of an intervening lien. However, in both ***Edney*** and ***First State Savings Bank***, the Nebraska Supreme Court necessarily implied that the senior mortgagee's knowledge of any intervening liens at the time of the release or forgiveness of debt is the crucial factor. Thus, we conclude that there is a corollary to the general rule that lack of knowledge of an intervening lien prevents merger: *When a mortgagee takes a deed from the record titleholder in consideration of the forgiveness of the mortgage debt with knowledge of an intervening lien, the mortgage debt is forgiven and the lien securing that debt is canceled as against the intervening lien.*

572 N.W.2d at 801-803. (Italics emphasis in last paragraph added).

Consistent with the above-espoused principles, merger law in the context of mortgages has been succinctly summarized by the Arkansas Supreme Court as follows:

The general rule is that the lesser estate in land will merge in the greater whenever the two estates are owned by the same person. This rule, however, does not apply where such merger would be inimical to the interests of the owner; hence, unless the intention to merge with knowledge of a junior lien or liens clearly appears, no merger results from the acquirement by the holder of a senior mortgage of the interests of the mortgagor, and the senior mortgage retains its priority as against all junior or

-13-

intervening liens upon the mortgaged property; and this rule is true whether the interest of the mortgagor is the legal title to the land, or the mere equity of redemption. 39 L.R.A. 384.

***Commonwealth Bldg. & Loan Ass'n v. Martin***, 185 Ark. 858, 863, 49 S.W.2d 1046, 1048 (1932).

Applying the doctrine of merger to the case at hand, we conclude that the "senior mortgagee's knowledge of any intervening liens at the time of the release or forgiveness of debt is the crucial factor" in determining whether a merger occurred. Here, the proof showed that the Bank accepted the deed in lieu of foreclosure from Shoemaker with actual and constructive notice of Scent's lien. The proof showed that the October 23, 2001, trust deed Scent held was on record for nearly ten months at the time that the Bank accepted the deed in lieu of foreclosure in full satisfaction of the obligation owed by Shoemaker. For her part, Scent testified that during 2002, the Bank began "rather aggressive activity of trying to get [her] to release [her] lien," indicating its actual knowledge of her then junior lien. Moreover, as we earlier noted, the deed in lieu of foreclosure recites that "this conveyance is for the full and complete satisfaction of the . . . promissory note and release of the . . . Deed of Trust." The deed in lieu does not contain any language indicating the Bank's intent that the fee and mortgage interests it then held should not merge, but remain separate.

Given these facts, it is our view that the trial court correctly determined that, in this transaction, the Bank "expressly gave and waived their rights under that deed of trust" and merger operated to extinguish their lien leaving nothing for the Bank to assign to Hood. Moreover, we agree with Scent's contention that the proper result was reached regardless of whether merger is applied to the facts at hand. An examination of the *intentions* of the Bank and Shoemaker – the parties to the deed in lieu of foreclosure – as evidenced by the express language of said document was clearly to effectuate the complete satisfaction and release of the obligation owed to the Bank. In summary, the parties accomplished the intended result.

V.

Hood asserts that the trial court erred in refusing to apply the equitable doctrine of laches to bar Scent's claim. The gist of Hood's argument is that Scent waited an unreasonable time to take action to protect her interest in the Property. Hood asserts that, after discovering a potential problem with the Property in 2002, *i.e.*, an apparent conflict in the priority of her lien and the Bank's lien, Scent waited some six years before filing the instant lawsuit in 2008. Hood concludes that under such circumstances, laches is appropriately applied to deny Scent relief.

The concept of laches has been explained as follows:

> The neglect of a person to make complaint, or bring suit in due season, he being sui juris and knowing the facts, or having the means of knowledge, is called laches; and where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in adverse rights, Courts of Equity refuse to interfere, they act either by analogy to the statutes of limitations, or upon their own inherent doctrine of discouraging antiquated demands. The Court realizes the difficulty of doing entire justice, when the original transaction has become obscured by time and the evidence lost, and deems it good public policy to allow claims and titles long acquiesced in to remain in repose.

*John P. Saad & Sons, Inc*., 715 S.W.2d at 46 (citing *Ledford v. Lee*, 29 Tenn. App. 660, 200 S.W.2d 393, 398 (1946), cert. denied (Tenn. 1947) (Quoting *Gibson's Suits in Chancery*, § 70, p. 87)).

This Court has observed that unreasonable delay in pursuing one's rights calls the equitable doctrine of laches into play to prevent the assertion of stale claims. *Nunley v. Nunley*, 925 S.W.2d 538, 542 (Tenn. Ct. App. 1996). In *Nunley*, we stated:

> We note, however, that delay by itself is not sufficient to invoke the doctrine of laches. As this court said in the case of *Brister v. Brubaker's Estate*, 336 S.W.2d 326, 332, 47 Tenn. App. 150, 162 (1960), "The determinative test as to laches, which may be available as a successful defense, is not the length of time that has elapsed, but whether, because of such lapse of time, the party relying on laches as a defense has been prejudiced by the delay."

*Id*.

At the close of the hearing, the trial court rejected Hood's affirmative defense of laches. The following exchange preceded the court's ruling:

> The Court: Let me ask you this. Are you all aware of any law that requires somebody holding a deed of trust to execute that within a reasonable period of time, or it somehow . . . lapses and it's no good? Is that the proposition you're putting forth now,

that [Scent] had a deed of trust, and because she didn't exercise that deed of trust option early on, that for some reason a period of time had elapsed, which basically precluded her from exercising that option? Is that the defense?

\* \* \*

Mr. Hix (Defense Counsel): I believe that goes to the very heart of the doctrine of laches is that you've slept on your rights, and other people have been prejudiced unnecessarily by that. And that's what we're sort of submitting here, that now the property has gone to third parties,[5] and we're here doing this, as opposed to if she had foreclosed in . . . 2002.

The Court: But she didn't know anything about the other property owners until like 2008.

Mr. Hix: No, sir, she didn't.

The Court: I just don't see the defense applicable on the facts that I've heard in this case. So the . . . affirmative defense of laches . . . – I don't find it to be applicable to the facts and circumstances surrounding this particular case.

\* \* \*

I solved the laches issue. What do you say about the damages that [Scent] [has] requested? [. . . .] I think part of what you were arguing – is that: Well, now you've sat on your hands during this entire time, and this all of a sudden went from a hundred and sixty to three hundred . . . and forty or fifty thousand dollars.

Mr. Hix: That was the heart or the large aspect of the affirmative defense of laches.

\* \* \*

---

[5]The proof was to the effect that the Property was subdivided into lots and developed, lots were sold, and houses constructed by some of the buyers who occupied them at the time of trial.

> If that's not applicable, then it is what it is.
>
> The Court: [. . . .]. Obviously, the [B]ank is sitting there, too, that's involved in this process, and they're seeing somebody may have a valid deed of trust there, . . . and no one is doing anything about it. However, the [B]ank . . . ends up doing other things, knowing that that's there. So I don't find that to be applicable and dismiss your affirmative defense of laches.

We agree with the trial court's reasoning in rejecting Hood's defense of laches. At trial, Scent agreed that she found it "puzzling" that all of the negotiations between her counsel and the Bank simply stopped by the end of 2003. Scent said she never figured out why the Bank needed her involvement in the first place, reasoning that "[i]f they had the first lien, they could have foreclosed, and they didn't." She simply assumed that the Bank was correct that they held a first lien and decided to "just let [her lien] sit there" at that point.

In 2005, Scent conducted her own title search, prompted by her intent to foreclose. As she explained it, she wanted to confirm that her lien was "still good and intact." By then, Scent said, she and her attorneys "knew we had a first lien because the [B]ank had already taken the deed in lieu of foreclosure," indicating to them that Scent's lien "was elevated to the first lien." Scent added that she did not proceed to foreclosure in the next three years because she was earning 8% on her investment and was confident that her lien was good. She also was aware of an appraisal by the Bank that showed the property was worth some $250,000. Scent believed that Shoemaker was trying to gather the money to retrieve his property and she decided to wait. She filed suit after determining that Shoemaker was not able to raise the money to save the property. In our view, the evidence does not lead to a conclusion that Scent unreasonably "sat on her rights" regarding the Property from 2002 until 2008 to the prejudice of Hood. Moreover, we are mindful in all of this, that Hood took assignment of the September 11, 2001, trust deed and note from the Bank with knowledge of the deed in lieu of foreclosure, the latter having been of record for more than two years. In addition, the assignment to Hood expressly references the June 2002 "Agreement to Convey and Conditionally Accept Deed In Lieu of Foreclosure" between the Bank and Shoemaker. As discussed earlier in this opinion, it is the effect of the deed in lieu of foreclosure, including the intentions surrounding that transaction, and not any failure to act on Scent's part, that operated to prejudice Hood – that is, to extinguish Hood's lien interest in the Property.

In summary, the proof shows that after her title search, Scent "felt secure that [she] had a good investment" and took no further action until August 2008, when she first learned

about the purported release of her trust deed and the activity on the Property. Within months, she hired local counsel to investigate the matter and filed suit. There is no bright-line rule for applying laches and, under the facts before us, we do not think that equity demands that the doctrine be applied against Scent. The trial court did not abuse its discretion in dismissing Hood's laches defense.

## VI.

As set out earlier in this opinion, Scent also raises issues on appeal. In particular, Scent asserts (1) that Hood attempts to raise a claim of a superior lien that she was required, but failed, to raise as a compulsory counterclaim in the trial court, and (2) that Hood is statutorily time-barred from asserting a claim of superiority of her deed of trust because more than ten years have passed since the obligation matured. As discussed above, we have decided the issues presented to this point in favor of Scent. Accordingly, we do not deem it necessary to address the additional issues Scent raises.

## VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Ellen W. Hood. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE